LIPSCOMB ET AL. *v.* HESS

[No. 376, September Term, 1968.]

*Decided October 8, 1969.*

The cause was heard before HAMMOND, C. J., and MARBURY, BARNES, MCWILLIAMS, FINAN, SINGLEY and SMITH, JJ.

*Jo V. Morgan,* with whom was *Andrew A. Lipscomb* on the brief, for appellants.

*Robert W. Beall* for appellee.

SINGLEY, J., delivered the opinion of the Court.

Lisle T. Lipscomb and Dorothy C. Lipscomb, co-partners trading as Adgate A. Lipscomb and Son (the Partnership) brought suit in the Circuit Court for Montgomery County against Walter Hess. The Partnership's declaration contained the common counts and two special counts for breach of contract, one of which relied on an oral contract, the other on a written contract. The Partnership sought damages in the amount of $200,000. Hess demanded particulars; then filed a general issue plea and a counterclaim, to which the Partnership countered with a general issue plea. After the pre trial depositions of Hess and Lisle T. Lipscomb had been taken, Hess filed interrogatories. When these had been answered, Hess moved for the entry of a summary judgment. From an order granting the motion as to the major portion of the Partnership's claim, this appeal was taken. The remainder of the claim, which related to other transactions between Hess and the Partnership, is not at issue here.

At the time summary judgment was entered, the lower court had before it certain facts alleged in the pleadings or developed by answers to the interrogatories and in the depositions.

In 1964, the Partnership, which then consisted of Lisle

T. Lipscomb and his father, Adgate A. Lipscomb, conducted an insurance brokerage business, with offices at 1000 Vermont Avenue, N.W., in the District of Columbia and at 4641 Montgomery Avenue, in Bethesda, Maryland. Hess had been an employee of the Partnership since 1953 and since 1958, had been in charge of the Bethesda office. For the year 1964, Hess' compensation was fixed at one-half of the net income of the Bethesda office, with a guaranteed minimum of $15,000. On 12 February 1964, Hess estimated that Bethesda would gross between $38,-000 and $40,000 for the year. There was testimony that gross income for the year 1965 was about $50,000.

According to Lisle Lipscomb, Hess, sometime in March or April of 1964, indicated that he was interested in purchasing a one-half interest in the Bethesda office. At a meeting at Kenwood Country Club in November or early December, Lipscomb and Hess agreed "* * * that it probably made a lot more sense for [Hess] to buy the whole business." Hess had no recollection of the meeting at Kenwood but agreed with Lipscomb that there had been a discussion at a Partnership Christmas party in December. According to Hess' version:

> "We discussed the purchase of accounts of the Bethesda office and the amount I was willing to pay for those accounts. And we also discussed my hiring Mr. Lipscomb to assist me with the business subsequent to January 1, 1965."

Lipscomb remembers the Kenwood conversation as involving a sale of the Bethesda business for two and one-half times gross commission income of $50,000, or about $120,000, and "we shook hands on it." Lipscomb said that Hess' principal concern was in making a portion of the purchase price deductible for tax purposes and that the possibility of a fee arrangement was discussed. Lipscomb explained, "This consultant fee approach would, in my opinion, have resulted in much more like $150,000. Which I told Walter in Kenwood prior to December 31, 1964. He said he didn't care, as long as he made $25,000 a year

he was happy." The Lipscomb version finds some support in a letter written by Hess' accountant to Hess on 5 December 1964, identified by Hess at the time of his deposition:

"Dear Walter:

"So that we might be in agreement as to the essence of your conversation with Mr. Lisle T. Lipscomb regarding the purchase by you of the insurance brokerage business operated from the Bethesda Office of, and owned by Adgate A. Lipscomb & Son, I feel it best to outline the major conclusions which you have indicated were reached;

"1. Walter Hess will purchase the accounts presently handled by the Bethesda Office of Adgate A. Lipscomb & Son, and listed on the attached Exhibit A, for the sum of $................

"2. Hess will assist in the collection of all outstanding receivables as of the date of transfer, which are the property of Lipscomb.

"3. Lipscomb will pay all liabilities due as of the transfer date on accounts of the Bethesda Office.

"4. Lipscomb will assist in any way possible with the transferring of the accounts listed on Exhibit A to the new entity.

"5. Hess agrees not to solicit accounts presently served by the downtown office of Lipscomb, a list of which will be furnished, for a period of ........... years, without the express permission of Lipscomb.

"6. Lipscomb agrees not [to] solicit the accounts now serviced by the Bethesda Office and listed in Exhibit A attached, for a period of ........ years, without the expression [sic] permission of Hess.

"7. Hess will establish a proprietorship to be known as Walter Hess, T/A Hess and Lipscomb, for the operation of this business.

"8. Hess will retain Lipscomb to render such technical assistance and advice as he shall require for a period of ............ years. Hess will compensate Lipscomb for this service at the greater of $............ per year, or ......% of the annual net taxable income of the insurance brokerage business, computed before inclusion of any deductions for these services.

"I have omitted any reference to specific dollars or percentages, since these are perhaps not finally determined.

"Please let me know if the above differs in any major respect with your understanding.

Very truly yours,<br>
/s/ Paul<br>
Paul Lambert, Jr."

In any event, on 31 December 1964, Hess wrote Lipscomb as follows:

"Dear Lisle:

"I am setting forth below an outline of the basic essentials of our verbal agreement concerning the purchase of the insurance brokerage business operated from the Bethesda office, so that your brother will be able to work from this in order to draw up the written agreement. I am also enclosing my check in the amount of $10,000.00 to purchase the accounts.

"1. Walter Hess will purchase the accounts presently handled by the Bethesda Office of Adgate A. Lipscomb & Son, and listed on the attached Exhibit A, for the sum of $10,000.00.

"2. Hess will assist in the collection of all outstanding receivables as of the date of transfer, which are the property of Lipscomb.

"3. Lipscomb will pay all liabilities due on the accounts purchased under Exhibit A.

"4. Lipscomb will assist in any way possible

with the transferring of the accounts listed on Exhibit A to the new entity.

"5. Hess agrees not to solicit accounts presently served by the downtown office of Lipscomb, a list of which will be furnished, for a period of ............ years, without the express permission of Lipscomb.

"6. Lipscomb agrees not to solicit the accounts now service[d] by the Bethesda Office and listed as Exhibit A attached, for a period of ........ years, without the express permission of Hess.

"7. Hess will establish a proprietorship to be known as Walter Hess, T/A Hess and Lipscomb, for the operation of this business.

"8. Hess will retain Lipscomb to render such technical assistance and advice as he shall require for a period of eleven years. Hess will compensate Lipscomb for this service at the rate of ten thousand dollars each year plus 30% of the taxable income above the first $50,000.00 of this taxable income derived out of the income from the insurance brokerage business, each year.

"I believe this includes the major items which we agreed on. If Andy has any further questions when he starts to draw up the contract I will be available to meet at his convenience.

/s/ Walter Hess"

The court below found that Exhibit A was never prepared, but there was evidence that at a later date, Hess prepared a schedule of the accounts he was retaining. Hess took over the operation of the Bethesda office on 1 January 1965. On 13 January R. H. L'Hommedieu, an employee of the Partnership, wrote Hess a letter outlining certain of the housekeeping details of the transfer, which is quoted in part:

"This will confirm our conversation wherein we agreed as to the method for handling wage statements, audits, return premiums, additional premiums, cancellations, etc. The following is my understanding of the agreement and if it is acceptable to you please sign the copy of this letter which is enclosed and return it to us.

* * *

"Walter, I think this is a complete understanding of what we have discussed and if agreeable to you please sign the enclosed copy of this letter and return it to me. If there are any discrepancies, please give me a call and we will discuss them."

Hess never signed and returned the copy of the letter, but testified, "* * * I frankly don't think there are any substantial discrepancies in that because I continued my 1965 operations in accordance with the information in that letter, up until such times as I could."

In February of 1965, there were a number of developments, the precise chronology of which cannot be fixed from the depositions: Hess gave Lipscomb a list of the accounts which were to be included in the sale; Lipscomb's counsel prepared and sent to Hess a draft of a formal agreement; on 19 February, Lipscomb took the agreement to Florida, to show it to his father; and on or about 23 February, the $10,000 check, enclosed in Hess' letter of 31 December, was presented for payment.

In March or April, a certain amount of disenchantment began to creep in. Lipscomb described it this way:

"Q. Well, would it be fair to say that certain dissensions and differences developed between you? A. Yes.

"Q. Over what you had agreed on? I mean, wouldn't that be a fair statement? A. Yes. When he didn't pay, I thought that it was ground for dissension.

"Q. Well, when was the first time that you

knew that Hess and you were having a difference of viewpoint about what the agreement was between you? A. After I returned from Florida, as I say in early March or April, I discussed the matter with Walter in the Bethesda office. He said that the way the contract was drafted was unsatisfactory because he had been advised—I assume by Lambert, but perhaps by someone else—that it would probably not meet Bureau of Internal Revenue standards as to the deductibility for that part of the purchase price which was being paid to us as so-called consultant fees. I suggested that he draft a contract that had the same provisions that would be satisfactory. Which he never did. Also, at the time, he brought up a new subject; to wit, that there were certain of the accounts that had been considered in arriving at the $120,000 plus purchase price, which he now had decided he didn't want. A couple of them were Lisbon, Stoeppelwerth, and a couple of other ones. I see we finally had that meeting with Walter in April of 1965. I did at the Bethesda office. I made a note of it.

"Q. And you are saying that that is the date that you first-knew that he was not going to sign this draft? A. That particular draft. But he did not at that time say he was going to break the contract. Just that it wouldn't meet deductibility requirements."

Nothing happened until 19 August when Lipscomb wrote to Hess, in part:

"We are beginning to entertain serious doubts as to your good faith in the transaction. Apparently you expect to eat your cake and have it too. You now have our Bethesda business but show a strange reluctance to pay for it. The $10,000.00 down-payment you made is just a

drop in the bucket, as compared with the balance of the agreed purchase price. As of this date you have failed to pay a single one of the monthly installments due under the agreement, there now being a total of $6,666.64 of such installment over-due. You haven't even paid a personal advance made to you of $157.30 back in December."

Hess replied four days later:

"Dear Lisle:

"I am in receipt of your letter dated August 19, 1965. At this time it is my opinion that we have no finalized agreement concerning the sale of the Bethesda Branch office. I am not indebted to you in the amount of $6,666.64, as indicated in your letter.

"Please recall that you sent to me in February 1965 an instrument of agreement of sale which I did not accept and advised you of its unacceptance. This instrument substantially changed the essential intent of our previous discussions. Subsequently, you and I met and decided that I would only purchase certain accounts because it was not now economically feasible for me to do otherwise. Since that time I have periodically notified your office of accounts that I would not purchase. Some of which you have already had returned to you.

\* \* \*

"Because of this I feel that the $10,000.00 which I have paid you is adequate payment for the value which I have received."

This letter is the first indication of the posture that Hess has since maintained: that the only agreement was one under which the Partnership sold, and that he purchased, certain selected accounts of the Bethesda office for $10,000, and not the business of the Bethesda office.

These were some of the facts before the lower court when it considered the motion for summary judgment. Maryland Rule 610 a 1 provides:

> "In an action, * * * a party against whom a claim is asserted, may at any time make a motion for a summary judgment in his favor as to all or any part of the claim on the ground that *there is no genuine dispute as to any material fact and that he is entitled to judgment as a matter of law.*" (emphasis added).

The limitations on summary judgment procedure are too well known to require elaboration. It is not a substitute for trial but a hearing to determine whether a trial is necessary, *Whitcomb v. Horman*, 244 Md. 431, 224 A. 2d 120 (1966); *Strickler Engineering Corp. v. Seminar, Inc.*, 210 Md. 93, 122 A. 2d 563 (1956), when there is no genuine controversy, *Pullman Co. v. Ray*, 201 Md. 268, 94 A. 2d 266 (1953). The purpose of the hearing is not to determine disputed facts, but to determine whether such issues exist. *Horst v. Kraft*, 247 Md. 455, 231 A. 2d 674 (1967); *Carroccio v. Thorpe*, 222 Md. 38, 158 A. 2d 660 (1960); *Tellez v. Canton R.R. Co.*, 212 Md. 423, 129 A. 2d 809 (1957); *White v. Friel*, 210 Md. 274, 123 A. 2d 303 (1956). If facts are susceptible of more than one inference, the inferences must be drawn in the light most favorable to the person against whom the motion is made, *Lawless v. Merrick*, 227 Md. 65, 175 A. 2d 27 (1961), and in the light least favorable to the movant, *Howard Cleaners of Baltimore, Inc. v. Perman*, 227 Md. 291, 176 A. 2d 235 (1961); *Roland v. Lloyd E. Mitchell, Inc.*, 221 Md. 11, 155 A. 2d 691 (1959).

The lower court seemed preoccupied by the fact that the parties contemplated a written contract which was never entered into, or alternatively, that there was an oral contract, not to be performed within one year, which was unenforceable because there was no writing to take it out of the Statute of Frauds. In its opinion the court "found" certain "undisputed" facts to support this con-

clusion, and in so doing, overlooked a basic principle of summary judgment procedure. "The function of the summary judgment procedure is not to try the case or decide issues of fact. It is merely to determine whether there is an issue of fact to be tried, and if there is none, to cause judgment to be rendered accordingly." *Tellez v. Canton R.R. Co., supra*, at 430.

This is certainly a case where there was a dispute as to almost every material fact. The motion for summary judgment should not have been granted, and we propose to reverse the lower court's order and remand the case for trial.

In a trial on the merits, facts may be found which will support one of several conclusions. On the one hand the trier of facts may determine that there was an oral agreement sometime prior to the Lambert letter of 5 December, to purchase what Lambert described in his 5 December letter and Hess described in his letter of 31 December as "the insurance brokerage business operated from the Bethesda office" for $120,000, of which $10,-000 was paid down and the balance of $110,000 was to be paid in 11 annual installments of $10,000 each. Should such facts be found, the Hess letter of 31 December, and the contract submitted by the Partnership in January or February 1965, neither of which was formally accepted, can be regarded as unaccepted proposals which varied the original bargain. If such an oral agreement is found to have existed, it may very well have been taken out of the operation of the Statute of Frauds when the Partnership fully performed its side of the bargain by turning over the business, and not just the accounts of the Bethesda office to Hess on 1 January 1965. We have consistently held that an agreement which has been fully performed by the party seeking to enforce it is not within the Statute of Frauds. *Home News, Inc. v. Goodman,* 182 Md. 585, 594, 35 A. 2d 442 (1944) ; *Ellicott v. Peterson,* 4 Md. 476 (1853).

Another possibility is that the Court may find that the oral contract did contemplate that the Partnership would

transfer the business and perform consultative or advisory services for 11 years and that the Hess letter of 31 December was signed by the party sought to be charged and took the case out of the Statute of Frauds. *Eastern Woodworks, Inc. v. Vance,* 206 Md. 419, 112 A. 2d 231 (1955). Absent such a finding, the oral agreement would remain within the ambit of the Statute, but would not leave the Partnership without a remedy, since it transferred the business but was never called on to render services. Our cases have consistently held that

> "* * * One who has performed to the extent that he could, under a contract unenforceable because of the Statute of Frauds, may recover on the common counts on a *quantum meruit* basis for the fair value of his services and money expended in reliance on the contract." *Duck v. Quality Custom Homes, Inc.,* 242 Md. 609, 614, 220 A. 2d 143 (1966)

and that

> "* * * Recovery may also be had under a common count where there is a special contract and the plaintiff has fully performed his part so that nothing remains to be done except to collect what is due." *Cline v. Fountain Rock Lime & Brick Co.,* 210 Md. 78, 90, 122 A. 2d 449 (1956).

For other examples of the application of the doctrine that a recovery, barred on a special count, may be had on the common counts, see *Mangione v. Braverman,* 234 Md. 357, 199 A. 2d 225 (1964); *Grant v. Curtin,* 199 Md. 363, 86 A. 2d 495 (1952); *Hamilton v. Thirston,* 93 Md. 213, 48 A. 709 (1901); *Baker v. Lauterbach,* 68 Md. 64, 11 A. 703 (1887).

A third possibility is that Hess is correct when he says that *Eastover Stores, Inc. v. Minnix,* 219 Md. 658, 150 A. 2d 884 (1959) is here controlling. Whether the parties entered into an agreement for the sale of the business on the one hand, or simply agreed to enter into a

formal contract on the other, is another issue of material fact to be determined by the fact-finder, which made impermissible the entry of summary judgment.

*Order reversed, case remanded for further proceedings; costs to be paid by appellee.*