766 A.2d 617

**Antonio JONES, a minor, etc., et al.,**

**v.**

**MID–ATLANTIC FUNDING COMPANY et al.**

**No. 59, Sept. Term, 2000.**

Court of Appeals of Maryland.

Feb. 9, 2001.

Saul E. Kerpelman (Lisa Smith of Saul E. Kerpelman & Asoc., on brief), Baltimore, for petitioners.

Una M. Perez (David A. Carter of Meyers, Rodbell & Rosenbaum, P.A., on brief), Annapolis, Natalie C. Magdeburger (Raymond L. Marshall of Whiteford, Taylor & Preston L.L.P., on brief), Towson, Angus R. Everton (Morgan, Shelsby, Carlo, Downs & Everton, P.A., on brief), Hunt Valley, for respondents.

Argued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and LAWRENCE F. RODOWSKY, (Retired, specially assigned), JJ.

CATHELL, Judge.

On May 5, 1994, petitioners, Carrie Holmes, individually and on behalf of her minor children, Antonio Jones and Erika Jones, filed an action [1] in the Circuit Court for Baltimore City against Mid–Atlantic Funding Co. (hereinafter Mid–Atlantic Funding), Darius Funding, Inc. (hereinafter Darius Funding), and Philip Hanson. Amendments by Interlineation brought MD–A Funding, Inc. (formerly Mid–Atlantic Funding Co.), Peter and Julie Ben–Ezra (hereinafter the Ben–Ezras), Consumer Management Corporation (hereinafter Consumer Management), and BBG Management into the action.[2]

---

**1.** In this action, Ms. Holmes alleged that her children had contracted lead poisoning through the negligence of respondents and respondents' violation of the Consumer Protection Act. Petitioner's negligence count also alleged a violation of Article 13, section 702 of the Baltimore City Code.

**2.** The Ben–Ezras, Consumer Management, and Mr. Hanson are the respondents in this appeal. Mid–Atlantic Funding, MD–A Funding,

Motions for Summary Judgment were filed by Philip Hanson, the Ben–Ezras, and Consumer Management. After two hearings on the Motions for Summary Judgment, the Circuit Court for Baltimore City granted the motions. Petitioners filed a Motion to Alter or Amend Judgment. It was denied by the Circuit Court. Petitioners filed an appeal to the Court of Special Appeals. Because BBG Management had not had a final judgment entered against it, petitioners had to voluntarily dismiss their initial appeal so they could dismiss BBG Management from the suit. Petitioners then filed a new appeal to the Court of Special Appeals.

On April 27, 2000 (in *Jones v. Mid–Atlantic Funding Company*, 131 Md.App. 614, 750 A.2d 638 (2000)), the Court of Special Appeals affirmed the decision of the Circuit Court for Baltimore City. Petitioners filed a Petition for Writ of Certiorari to this Court. We granted their Petition. Petitioners have presented two questions for our review:

I. Is a landlord's knowledge of lead hazards in a rented premises a jury issue to be decided on the totality of the evidence under this Court's recent ruling in *Brown v. Dermer*, 357 Md. [344, 744 A.2d 47] (2000), or are trial courts and the Court of Special Appeals to continue weighing, balancing, and resolving evidence of knowledge on a landlord's motion for summary judgment?

II. Does this Court's ruling in *Pittman v. Atlantic Realty Co.*, 359 Md. 513[, 754 A.2d 1030] (2000) mandate a reversal of the Court of Special Appeals' holding herein, based upon *Pittman v. Atlantic Realty Co.*, 127 Md.App. 255[, 732 A.2d 912] (1999), that whenever there is a conflict between interrogatory answers and deposition testimony, interrogatories may be disregarded and the deposition credited[?]

Inc., and BBG Management were dismissed from the action by petitioners. Although the record is unclear, it appears that Darius Funding was not served with the Complaint and Darius Funding has not participated in any pleadings.

In response to question I, we hold that a trial court should follow the test enunciated in *Brown v. Dermer,* 357 Md. 344, 744 A.2d 47 (2000), when ruling on a motion for summary judgment in a lead poisoning case.[3] We hold that the trial court improperly granted, and the Court of Special Appeals improperly affirmed, summary judgment in the case *sub judice.* We shall reverse the decision of the Court of Special Appeals with instructions for that court to reverse the decision of the Circuit Court for Baltimore City and to remand the case to the Circuit Court for further proceedings consistent with this opinion. Since we are reversing the decision of the Circuit Court and the Court of Special Appeals in respect to question I, we need not address question II,[4] although we do not perceive this to be a *Pittman* case in the first instance.

---

**3.** Our opinion in *Brown v. Dermer* was filed on January 14, 2000, after the trial court rendered the decision in this case. Therefore, the holding of *Brown* was not available as guidance to the trial court.

**4.** We note that in petitioners' brief, petitioners' counsel made several statements that have little place in appellate practice. He stated:

> [I]t is clear that the analysis of the Court of Special Appeals is based upon the insulated appellate judge's view.... Neither does the judge's life experience prepare him to understand.... The Court of Special Appeals judge's world is not the world of the under privileged, of the tenement dweller....
>
> ....
>
> ... [T]he Court below again uses wild speculation to come up with an explanation.... This explanation ... reveals how the Court of Special Appeals views facts through a privileged socioeconomic lens that refuses to see the reality of the Plaintiffs' living conditions.... [T]he Court below seems willing to come up with *any* explanation of the facts to ensure that the Plaintiffs do not receive a jury trial.
>
> ....
>
> The Court's analysis would be almost comical, if it were not such a real life tragedy....

We want to make petitioners' counsel completely aware that although we respect the right of each party to make their points, counsel should be hesitant to make assumptions as to the environment that a judge was raised in or currently resides in. Counsel should be even more hesitant to comment on such assumptions in formal court proceedings and to improperly attribute the decisions of judges to those environmental factors. If counsel is not aware of, then he should become aware of, the preamble to the Maryland Rules of Professional Conduct which provides that lawyers' responsibilities are, in relevant part:

## Facts

There are genuine disputes as to the material facts of this case. Because we are examining the granting of a motion for summary judgment, we will examine the facts in the light most favorable to the nonmoving party—in the case *sub judice*, petitioners.

Carrie Holmes and two of her children, Antonio Jones and Erika Jones,[5] moved to 1229 North Central Avenue, a two-story row house located on the east side of Baltimore City, sometime in 1984–85.[6] Carrie Holmes signed a written lease with Consumer Management,[7] which was managing the property for the Ben–Ezras, who had purchased the property in September of 1983.[8] Ms. Holmes testified that she inspected the property prior to moving in and that the property "was in fair condition. There wasn't no chipped paint, no nothing. It

---

As advocate, a lawyer zealously asserts the client's position *under the rules of the adversary system.* ...

. . . .

... A lawyer should demonstrate respect for the legal system and for those who serve it, *including judges* . ... [Emphasis added.] Rule 8.2 (Judicial and legal officials) of the Maryland Rules of Professional Conduct states that:

(a) A lawyer shall not make a statement that the lawyer knows to be false *or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge.* ... [Emphasis added.]

5. Antonio Jones was born on August 1, 1983 and Erika Jones was born on November 1, 1985.

6. Erika Jones may not have been born when Ms. Holmes first moved into 1229 North Central Avenue.

7. Consumer Management is a property management company that manages approximately 150 to 200 properties. Consumer Management manages properties for landlords, providing services such as arranging for repairs, rent collection, evictions, and renting vacant properties.

8. The Ben–Ezras conveyed the property at 1229 North Central Avenue to Darius Funding on February 28, 1987, for the consideration of $11,500.00. Darius Funding then conveyed the property to Mid–Atlantic Funding on March 10, 1987. Mid–Atlantic Funding then leased the property back to Darius Funding for ninety-nine years. Darius Funding then transferred the lease to Philip Hanson on March 11, 1987, for a consideration of $19,100.00.

was already painted nice and clean all the way through." [9] After moving into the row house, however, Ms. Holmes started to notice that the inside paint was peeling.[10] For example, as she would clean the walls, the paint would peel. She noticed problems with peeling paint in the dining room, the bedrooms, and the bathroom.

Harry Holmes, the brother of Carrie Holmes, moved in with Ms. Holmes sometime shortly after she began her tenancy and lived with her for two years from approximately sometime in 1985 to 1987. Mr. Holmes testified that when he moved into 1229 North Central Avenue, there were problems with the row house. He stated that "[i]t's a shack. . . . It was cold. It was holey, needed stucco, needed sanding, needed painting, needed windows, needed floors, needed doors, needed everything." Mr. Holmes also stated that the window paint was peeling.

Antonio and Erika Jones were diagnosed with lead poisoning during 1986 while residing at 1229 North Central Avenue.[11] During a routine checkup on October 17, 1986, Antonio Jones had blood taken and the test results registered a 37 ug/dL.[12] Subsequent blood tests performed on Antonio Jones

---

9. On the rental agreement, there was a notation that during the inspection by Ms. Holmes and a representative of Consumer Management prior to petitioners moving in, a cracked window was discovered and the closets needed to be painted.

10. In her Answers to Interrogatories, Ms. Holmes stated that:

There was flaking and chipping paint in 1229 N. Central Avenue almost the entire time that we lived there. I first observed flaking and chipping paint on all the walls but mostly in the dining room, bedrooms and bathroom after we had lived at the property just six (6) months. There was also chipping paint in the basement, in the kitchen and on the outside front of the house.

11. The row house at 1229 North Central Avenue was the residence where Antonio and Erika Jones spent the majority of their time.

12. μg/dL is an abbreviation for micrograms per deciliter. A reading of 37 μg/dL means the child had 37 micograms of lead for every deciliter of blood. A child is considered to have elevated lead levels in his blood if the measurement is at least 10 μg/dL. *Preventing Lead Poisoning in Young Children,* A Statement by the Center for Disease Control (1991). We have seen the abbreviation for micrograms per deciliter as μg/dL

showed lead levels of 33 ug/dL on December 10, 1986, 34 ug/dL on January 20, 1987, 38 ug/dL on April 2, 1987, 32 ug/dL on March 11, 1988, 62 ug/dL on July 25, 1988, and 41 ug/dL on October 5, 1988. Erika Jones was also originally diagnosed during a routine checkup. Her blood showed lead levels of 25 ug/dL on October 17, 1986, 19 ug/dL on December 10, 1986, 28 ug/dL on April 2, 1987, 44 ug/dL on July 28, 1988, and 27 ug/dL on January 5, 1989.

Carrie Holmes testified that the first time she called Consumer Management was one month before her children were diagnosed with lead poisoning.[13] She testified that she "called the landlord[14] and told them to send me some paint and I didn't never get no paint." When questioned as to why she requested the paint, Ms. Holmes testified that "I figured that the house needed painting. It had not been painted since I had been there." Ms. Holmes was told that Consumer Management does not give out paint. Once Ms. Holmes learned that her children had been diagnosed with lead poisoning, she once again called Consumer Management. She testified that she spoke to a woman at Consumer Management and she stated that "[w]hen I called her, I told her my children had lead. She said she don't know how the children got it. I said they get tested from the clinic. That is how I knew my children had it. That is when I called the Health Department."

Harry Holmes testified that while he was living at 1229 North Central Avenue, a man, he described as being drunk, came to the row house to paint. Mr. Holmes stated that this occurred in 1986 or 1987. He stated that a man showed up and "[h]e just said that he was from maintenance, that is all. He was going to paint." Mr. Holmes testified that the man

---

and ug/dL (micrograms per deciliter). We shall use ug/dL as that is what is used by the parties.

13. Ms. Holmes also testified that she called Consumer Management one time when she was having problems with her heat at 1229 North Central Avenue. Consumer Management sent a repairman to the row house to fix the heat within a couple of days.

14. Consumer Management was the property manager. Because of the services Consumer Management provided to the landlords, it acted as the *de facto* landlord to the tenants.

entered the house, scraped the walls for about an hour and then left, never to return.

The Baltimore City Health Department first issued an Emergency Violation Notice and Order to Remove Lead Nuisance to Mr. Philip Hanson on February 25, 1988.[15] The notice cited thirty-three lead-based paint hazards both inside the row house and on the exterior. These included violations in the following rooms: second floor bathroom, second floor rear room, second floor middle room, second floor hall, second floor front room, stair treads and posts, kitchen, first floor middle room, first floor front room, and basement. A second code violation was issued for 1229 North Central Avenue in March of 1989 and it included other types of violations such as a defective wall in the kitchen, a defective wall in the stairway, a defective stairway, a defective wall in the bathroom, a floor covering in the bathroom that was not impervious to water, cracked window or glass in the front bedroom, a defective wall in the middle bedroom, and a defective ceiling in the dining room.

Petitioners filed a Complaint in the Circuit Court for Baltimore City on May 5, 1994 against Mid–Atlantic Funding, Darius Funding, and Philip Hanson as the owners of the property at 1229 North Central Avenue. The Complaint set forth thirty counts, which included the same five counts for each minor plaintiff as to every defendant. The five counts alleged in the Complaint for each minor plaintiff were negligence, the mother's claims in her own right for deprivation of her child's services during minority, a Maryland Consumer Protection Act[16] claim, strict liability, and punitive damages.

---

**15.** Mr. Hanson never directly received this notice of violation because the Baltimore City Health Department sent the violation to 1229 North Central Avenue, where petitioners lived, instead of to Mr. Hanson's home or office.

**16.** The Maryland Consumer Protection Act is codified in Md.Code (1975, 2000 Repl.Vol., 2000 Cum.Supp.), Title 13 of the Commercial Law Article.

Petitioners filed an Amendment by Interlineation on June 27, 1994, which added counts thirty-one through forty and brought MD–A Funding, formerly Mid–Atlantic Funding, into the action. Petitioners filed a second Amendment by Interlineation on August 30, 1994, that added counts forty-one through fifty and made the same allegations against Peter and Julie Ben–Ezra. A third Amendment by Interlineation was filed on February 28, 1995, that added counts fifty-one through fifty-six and brought Consumer Management into the action. A fourth Amendment by Interlineation was filed on January 14, 1997, that added counts fifty-seven through sixty-two and brought BBG Management into the action.[17]

Respondents, the Ben–Ezras, filed a Motion for Partial Dismissal as to counts forty-two, forty-four, forty-five, forty-seven, and forty-nine. The motion was granted on May 1, 1995 by the Circuit Court for Baltimore City and also included the dismissal of count fifty. The only counts remaining in the suit against the Ben–Ezras were the negligence and Consumer Protection Act counts. Respondent, Consumer Management filed a Motion to Dismiss counts fifty-two and fifty-five of the Complaint. This motion was granted by the Circuit Court for Baltimore City on October 17, 1995. The only counts remaining in the suit against Consumer Management were the negligence and Consumer Protection Act counts. Respondent, Philip Hanson, filed a Motion to Dismiss on October 4, 1996. Mr. Hanson requested that counts twenty-two through twenty-five and twenty-seven through thirty (all of the counts except the negligence counts) be dismissed.[18]

17. Consumer Management and BBG Management only had six counts filed against them. The six counts for Consumer Management and BBG Management were negligence for each minor, a violation of the Consumer Protection Act for each minor, and Ms. Holmes' claims in her own right for deprivation of her child's services during minority for each minor child. The counts for strict liability and punitive damages were not included for these two defendants.

18. Counts one through ten were filed against Mid–Atlantic Funding and were dismissed when Mid–Atlantic Funding was dismissed from the action. Counts eleven through twenty were filed against Darius Fund-

The Ben–Ezras filed a Motion for Summary Judgment on all remaining counts on October 10, 1996. The Ben–Ezras asserted that they did not receive notice of the existence of chipping, flaking or peeling lead-based paint and that because this fact, according to them, was not disputed, they should be granted summary judgment. Philip Hanson filed a Motion for Summary Judgment on October 23, 1996. Mr. Hanson alleged that there was no dispute of material fact, he was not negligent in his maintenance of 1229 North Central Avenue, and he had no knowledge of chipping or flaking paint in the premises. Consumer Management filed a Motion for Summary Judgment on October 23, 1996. Consumer Management asserted that there was no dispute of material fact and that Consumer Management did not have notice or knowledge of any lead-based paint at 1229 North Central Avenue. Petitioners filed a Response to all three Motions for Summary Judgment.

---

ing. Darius Funding apparently is not a party to the suit, having not been served. See footnote 2, *supra*. Counts twenty-one through thirty were filed against Mr. Hanson. All of the counts against Mr. Hanson were dismissed except for counts twenty-one and twenty-six. Counts thirty-one through forty were filed against MD–A Funding Inc. These counts were dismissed when MD–A Funding Inc. was dismissed from the suit. Counts forty-one through fifty were filed against the Ben–Ezras and counts forty-two, forty-four, forty-five, forty-seven, forty-nine, and fifty were dismissed. Counts fifty-one through fifty-six were filed against Consumer Management. Counts fifty-two and fifty-five were dismissed. Counts fifty-seven through sixty-two were filed against BBG Management. These counts were dismissed when BBG Management was dismissed from the suit.

In summary, respondents, Consumer Management, Mr. Hanson, and the Ben–Ezras, had the following counts against them remaining when they filed their Motions for Summary Judgment. Consumer Management had counts fifty-one (Antonio Jones—negligence), fifty-three (Antonio Jones—Consumer Protection Act), fifty-four (Erika Jones—negligence), and fifty-six (Erika Jones—Consumer Protection Act), as part of its Motion for Summary Judgment. The Ben–Ezras had counts forty-one (Antonio Jones—negligence), forty-three (Antonio Jones—Consumer Protection Act), forty-six (Erika Jones—negligence), and forty-eight (Erika Jones—Consumer Protection Act), as part of their Motion for Summary Judgment. Mr. Hanson had the following counts as part of his Motion for Summary Judgment, count twenty-one (Antonio Jones—negligence) and count twenty-six (Erika Jones—negligence).

A hearing was held on all open motions on December 4, 1996 before the Circuit Court for Baltimore City. At the hearing, petitioners submitted as to Mr. Hanson's Motion to Dismiss counts twenty-two, twenty-three, twenty-four, twenty-five, twenty-seven, twenty-eight, twenty-nine, and thirty. The Circuit Court signed an order on December 11, 1996 granting that Motion to Dismiss.[19] The three Motions for Summary Judgment filed by Mr. Hanson, Consumer Management, and the Ben–Ezras were then argued. At the end of the hearing, the Circuit Court allowed petitioners fifteen days to file a response to Mr. Hanson's Reply to petitioners' Reply to the Motion for Summary Judgment. The Circuit Court, on December 5, 1996, signed an Order that granted Consumer Management's Motion for Summary Judgment on counts fifty-one and fifty-six. The Order also stated in a handwritten passage by the Circuit Court on the bottom of the Order that "[i]t is further ordered that defendant's motion for judgment on the issue of negligence is denied as there are disputes regarding the material issues of notice and opportunity to cure."[20]

After several pleadings were filed by both petitioners and Mr. Hanson regarding Mr. Hanson's Motion for Summary Judgment, the Circuit Court, with the Honorable John Carroll Byrnes presiding, held a second hearing on the three Motions for Summary Judgment.[21] The Circuit Court granted the

---

**19.** Other Motions to Dismiss had been granted previously. The Motions to Dismiss are not before the Court.

**20.** It appears from the record that the Circuit Court judge made a mistake when granting Consumer Management's Motion for Summary Judgement. The Order stated that the motion was for counts fifty-one, fifty-three, fifty-four, and fifty-six. The judge granted summary judgment on counts fifty-one and fifty-six. The judge wrote on the Order that summary judgment on the negligence counts was denied, however, the judge granted summary judgment on count fifty-one. Counts fifty-one and fifty-four were the negligence counts against Consumer Management. Summary judgment was denied for count fifty-three; this was a Consumer Protection Act count.

**21.** Judge Byrnes did not preside over the first motions hearing. Petitioners asserted that this motions hearing was only on Mr. Hanson's

three Motions for Summary Judgment, finding that the respondents had not received notice of the lead-based paint flaking, peeling, or chipping in the row house. The petitioners filed a Motion to Alter or Amend Judgment on October 15, 1997. This motion was denied by the Circuit Court.

Petitioners filed a Notice of Appeal to the Court of Special Appeals on December 31, 1997. Petitioners were required to dismiss this first appeal because there had not been a final judgment in respect to BBG Management. At their request, the Circuit Court granted a dismissal, without prejudice, as to BBG Management, and petitioners filed a timely Notice of Appeal to the Court of Special Appeals on May 27, 1999.

The opinion filed by the Court of Special Appeals on April 27, 2000, affirmed the decision of the Circuit Court for Baltimore City granting the respondents' Motions for Summary Judgment. The Court of Special Appeals stated that "[i]n sum, appellants [petitioners] failed to produce evidence sufficient to prove that appellees [respondents] knew or should have known of deteriorated paint at the Premises, and therefore, the trial judge was legally correct when he granted summary judgment in favor of the appellees." Petitioners filed a Petition for Writ of Certiorari, which we granted.

## Discussion

We hold that the Circuit Court for Baltimore City and the Court of Special Appeals improperly resolved genuine disputes of material fact in this case in granting summary judgment to

Motion for Summary Judgment because the judge presiding over the first hearing had already ruled on Consumer Management's Motion for Summary Judgment and the judge was going to, but had not yet, ruled on the Ben–Ezras' Motion for Summary Judgment. Judge Byrnes held that he would hear arguments on the Motions for Summary Judgment from all three respondents. Judge Byrnes found that the judge had not ruled on the Motions for Summary Judgment from Mr. Hanson and the Ben–Ezras. Judge Byrnes also found that the Order granting part of Consumer Management's Motion for Summary Judgment was ambiguous and that if summary judgment is granted as to Mr. Hanson and the Ben–Ezras, the principals, then it would be "ridiculous" to keep in Consumer Management, the agent.

the respondents. We will look at the standard for applying summary judgment and consider how the facts of this case were considered pursuant to that standard.

### A. Standard for Summary Judgment

■■■ The trial court, in accordance with Maryland Rule 2–501(e), shall grant a motion for summary judgment "if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." In reviewing the grant of a summary judgment motion, we are concerned with whether a dispute of material fact exists. *Williams v. Mayor & City Council of Baltimore,* 359 Md. 101, 113, 753 A.2d 41, 47 (2000); *Hartford Ins. Co. v. Manor Inn of Bethesda, Inc.,* 335 Md. 135, 144, 642 A.2d 219, 224 (1994); *Gross v. Sussex, Inc.,* 332 Md. 247, 255, 630 A.2d 1156, 1160 (1993); *Beatty v. Trailmaster Prods., Inc.,* 330 Md. 726, 737, 625 A.2d 1005, 1011 (1993); *Arnold Developer, Inc. v. Collins,* 318 Md. 259, 262, 567 A.2d 949, 951 (1990); *Bachmann v. Glazer & Glazer, Inc.,* 316 Md. 405, 408, 559 A.2d 365, 366 (1989); *King v. Bankerd,* 303 Md. 98, 110–11, 492 A.2d 608, 614 (1985). "A material fact is a fact the resolution of which will somehow affect the outcome of the case." *King,* 303 Md. at 111, 492 A.2d at 614 (citing *Lynx, Inc. v. Ordnance Prods., Inc.,* 273 Md. 1, 8, 327 A.2d 502, 509 (1974)). "[A] dispute as to facts relating to grounds upon which the decision is not rested is not a dispute with respect to a *material* fact and such dispute does not prevent the entry of summary judgment." *Salisbury Beauty Schs. v. State Bd. of Cosmetologists,* 268 Md. 32, 40, 300 A.2d 367, 374 (1973).

■■■ The purpose of the summary judgment procedure is not to try the case or to decide the factual disputes, but to decide whether there is an issue of fact, which is sufficiently material to be tried. *See Goodwich v. Sinai Hospital of Baltimore, Inc.,* 343 Md. 185, 205–06, 680 A.2d 1067, 1077 (1996); *Coffey v. Derby Steel Co.,* 291 Md. 241, 247, 434 A.2d 564, 567–68 (1981); *Berkey v. Delia,* 287 Md. 302, 304, 413 A.2d 170, 171 (1980). The hearing on a motion for summary

judgment is not to determine disputed facts but to determine whether there are disputed facts. *Sumner v. Travelers Indemnity Co.,* 235 Md. 480, 483, 201 A.2d 775, 777 (1964) (quoting *Carroccio v. Thorpe,* 222 Md. 38, 43, 158 A.2d 660, 662 (1960)). Thus, once the moving party has provided the court with sufficient grounds for summary judgment, the nonmoving party must produce sufficient evidence to the trial court that a genuine dispute of a material fact exists. *See, e.g., Hoffman Chevrolet, Inc. v. Washington County Nat'l Sav. Bank,* 297 Md. 691, 712, 467 A.2d 758, 769 (1983).

On a motion for summary judgment, the evidence, including all inferences therefrom, is viewed in the light most favorable to the nonmoving party. *Natural Design, Inc. v. Rouse Co.,* 302 Md. 47, 62, 485 A.2d 663, 671 (1984); *Doe v. Board of Educ., Montgomery County,* 295 Md. 67, 70, 453 A.2d 814, 815 (1982); *Coffey v. Derby Steel Co.,* 291 Md. 241, 246, 434 A.2d 564, 567 (1981). If the facts presented to the trial court on a motion for summary judgment are susceptible to more than one inference, the inferences must be drawn in the light most favorable to the person against whom the motion is made, and in the light least favorable to movant. *James v. Tyler,* 269 Md. 48, 53, 304 A.2d 256, 259 (1973) (quoting *Lipscomb v. Hess,* 255 Md. 109, 118, 257 A.2d 178, 183 (1969)).

This Court has recently had the opportunity to examine the granting of summary judgment in a lead-based paint poisoning case. In *Brown v. Dermer,* 357 Md. 344, 744 A.2d 47 (2000), in which a claim of negligence and a violation of the Baltimore City Housing Code were involved, minor petitioners, twins, were diagnosed with elevated blood-lead levels. After being notified of the minors' blood-lead levels, the Baltimore City Health Department inspected the premises and issued a violation notice to defendants, citing thirty violations. Plaintiffs filed suit, alleging that defendants were negligent and seeking damages for lead paint poisoning. Defendants responded that although they were aware that lead-based paint was banned and that interior surfaces of rental properties must be kept free from loose, flaking, or peeling paint, defendants were

unaware of any loose, flaking, or peeling paint on the premises.

Defendants filed a Motion for Summary Judgment, asserting that, prior to the violation from the Baltimore City Health Department, they (1) had no knowledge of the hazard of lead-based paint, (2) were unaware that flaking and chipping paint in older houses could pose a danger to children, (3) had never before received a lead paint violation notice or had a lead paint suit filed against them, and (4) were unaware that the premises contained lead paint in a deteriorated condition. The trial court granted the motion for summary judgment. It determined that there was no evidence from which a jury could infer that the respondents had knowledge of the presence of lead-based paint before they were provided with notice by the Baltimore City Health Department violation. The Court of Special Appeals affirmed the decision of the trial court, finding that there was no evidence to show that the defendants knew or had reason to know that the deteriorated paint contained lead. We reversed the decision of the Court of Special Appeals.

Chief Judge Bell, writing for the Court, stated that:

Thus, to survive summary judgment, a plaintiff alleging lead paint poisoning caused by a landlord's negligence in failing to correct a defective condition in a leased dwelling must first meet the "reason to know" test. Under this test, a plaintiff must present evidence that establishes that the landlord knew or had reason to know of a condition on the premises posing an unreasonable risk of physical harm to persons in the premises. *See Restatement* § 358(1)(b) ("knows or has *reason to know* of the *condition*") (emphasis added). The fact that a defendant is a landlord or engages in a certain trade is not enough to meet the reason to know standard. Some evidence that, by virtue of those facts, the defendant has knowledge sufficient to support an inference of knowledge of the condition is required. [*Richwind Joint Venture 4 v. Brunson,* 335 Md. 661, 677, 645 A.2d 1147, 1154–55 (1994) ]. It follows that, in order to present the question of the respondents' negligence to the jury in a lead

poisoning negligence action based upon a violation of the statutory duties in §§ 702 and 703 [of the Baltimore City Housing Code], as is the case *sub judice, all that a plaintiff must show in order to satisfy the reason to know element is that there was flaking, loose or peeling paint and that the defendant had notice of that condition.* It need not be shown that the flaking, loose or peeling paint was lead-based.

Once it is established that the landlord has reason to know of the defective condition, *i.e.,* the existence of flaking, loose or peeling paint, *a plaintiff must present facts that establish that he or she or a landlord of ordinary intelligence with the same knowledge, should realize the risk of lead poisoning.* The test at this stage is one of foreseeability; it encompasses what a person of ordinary prudence should realize, not what he or she actually did know or realize. Thus, the only question for the court to decide at the summary judgment stage is whether the lead-based paint injury is without, or within, the range of reasonable anticipation and probability.

*Id.* at 361–62, 744 A.2d at 57 (emphasis added). Chief Judge Bell, applying the facts in *Brown* to the test, went on to state that:

In the case *sub judice,* the first prong of the test is clearly satisfied. The petitioners' mother testified that she complained to the respondents about the deteriorating condition of the paint well before the petitioners were born. The respondents of course deny receiving notice of the condition. Accepting the petitioner's explanation as true, as the law requires the trial court to do, we conclude that a genuine dispute of material fact exists regarding the landlords' knowledge of the dangerous condition.

The second prong is also satisfied. The lead poisoning injury alleged here is within the range of reasonable anticipation and probability. . . . Moreover, the respondents acknowledged that they were aware of the Baltimore City and Maryland State laws banning lead-based paint, and of the City ordinances that required rental properties to be kept in

a habitable condition, including requiring the interior surfaces to be kept free of loose, flaking or peeling paint. Under these circumstances, we hold that a jury could find that a reasonably prudent landlord would realize, after receiving notice, that flaking, loose or peeling paint presents an unsafe or dangerous condition and thus would investigate and correct the condition. The effectiveness of the housing code in promoting health and safety would be severely undermined if landlords were permitted to use lack of knowledge that the flaking paint was lead-based paint as a defense against civil liability for injuries proximately caused by their failure to comply with the law.

*Id.* at 367–69, 744 A.2d at 60–61 (footnotes omitted).

### B. Facts Applied to the Standard for Summary Judgment

■ As stated, *supra*, when considering the granting of summary judgment we examine the facts and the inferences derived from the evidence in the light most favorable to the nonmoving party, which in the case *sub judice,* is petitioners. Looking at the facts and applying them to the standard for summary judgment set forth by this Court in *Brown v. Dermer,* the motion for summary judgment in the case *sub judice* should have been denied. In its opinion, the Court of Special Appeals looked at the individual facts in isolation instead of in the totality of the circumstances and also failed to look at the facts in the light most favorable to the nonmoving party.

The respondents, in the case *sub judice,* contend that they did not receive adequate notice from petitioners. Petitioners, in their briefs to this Court and at oral argument, advanced three facts that were before the lower courts that they think, with reasonable inferences, if believed by that trier of fact, would sufficiently establish that respondents had notice of chipping or flaking paint conditions in the house. The facts are that: (1) Ms. Holmes testified that she called Consumer Management one month before her children tested positive for elevated levels of lead in their blood and requested paint, (2)

Mr. Holmes testified that a man, who appeared to be drunk, showed up at the row house stating that he was from maintenance and was there to paint, and (3) Ms. Holmes testified that she called Consumer Management after her children tested positive for elevated lead poisoning and told Consumer Management about her children's tests.

In addressing the two phone calls from Ms. Holmes to Consumer Management, the Court of Special Appeals looked at the phone calls individually and without applying the most favorable inference to petitioners. The Court of Special Appeals stated that:

Appellants maintain that Carrie Holmes's call to the management company requesting paint was sufficient to alert the Consumer Management Corporation and the landlord of the defective condition. This argument is without merit. As Ms. Holmes described this call in her deposition, she could have been requesting paint for numerous reasons, none of which would lead the appellees to infer that the Premises contained deteriorated paint. For example, Ms. Holmes may have wanted to repaint her home in order to cover stains or to alter the color scheme. According to her deposition testimony, Ms. Holmes did not inform the agent of Consumer Management Corporation with whom she spoke that she needed new paint because her existing paint was either chipping, loose, flaking, or peeling. Without information in addition to a mere request for paint, the management company had no way of knowing that the existing paint (which, at most, was three years old) had deteriorated.

Likewise, Consumer Management Corporation's knowledge that the children had developed lead poisoning did not give the management company reason to know of deteriorated paint at the Premises. Ms. Holmes did not accuse the landlord of having been the cause of the poisoning and Consumer Management Corporation could not be expected to infer that the Premises contained deteriorated paint from the fact that the children had been poisoned by lead paint. The children could have contracted lead paint poisoning

from any number of locations other than the Premises: for example, from lead paint at their playground or in the homes of friends, neighbors, or relatives.

The Court of Special Appeals then examined Mr. Holmes' testimony that a man had arrived at Ms. Holmes' house claiming to be from maintenance. The Court stated that:

> It is true that the drunk man did tell Holmes that he was "from maintenance," but there was no evidence to corroborate that representation. More specifically, there was no testimony that either Ms. Holmes or her brother had requested that their home be painted prior to the time of the visit from the man "from maintenance." In addition, there was no indication that any of the appellees had sent a painter to the Premises. Possibly the drunk stranger pretended to be "from maintenance" in order to gain entry into the home to later burglarize it, given Ms. Holmes's testimony that the Premises had been broken into on numerous occasions. Because agency was not proven, whatever knowledge the inebriated man may have gained concerning the condition of the paint at the Premises cannot be imputed to the appellees.
>
> In sum, appellants failed to produce evidence sufficient to prove that appellees knew or should have known of deteriorated paint at the Premises, and therefore, the trial judge was legally correct when he granted summary judgment in favor of the appellees.

The Court of Special Appeals analysis and conclusion did not properly look at the facts in the totality of the circumstances and in a light, including all inferences, that is most favorable to the party responding to the motion for summary judgment.

We find that when the three main facts put forth by petitioners are examined in their totality and in the light most favorable to petitioners, the nonmoving party, the facts *might* satisfy a trier of fact that the "reason to know" test was met and that petitioners had provided sufficient notice to the respondents. We distinguished the "reason to know" test in

*Richwind Joint Venture 4 v. Brunson,* 335 Md. 661, 676–77, 645 A.2d 1147, 1154 (1994), when we stated that:

Finally, this Court has distinguished between "reason to know," which is required by § 358 [of the *Restatement (Second) of Torts* ], and "should know," which is utilized in other sections, in the following manner:

" 'Both the expression "reason to know" and "should know" are used with respect to existent facts. These two phrases, however, differ in that "reason to know" implies no duty of knowledge on the part of the actor whereas "should know" implies that the actor owes another the duty of ascertaining the fact in question. "Reason to know" means that the actor has knowledge of facts from which a reasonable man of ordinary intelligence or one of the superior intelligence of the actor would either infer the existence of the fact in question or would regard its existence as so highly probable that his conduct would be predicated upon the assumption that the fact did exist. "Should know" indicates that the actor is under a duty to another to use reasonable diligence to ascertain the existence or non-existence of the fact in question and that he would ascertain the existence thereof in the proper performance of that duty.' "

[*State v.]   Feldstein,* [207 Md. 20, 33, 113 A.2d 100, 106 (1955)] (quoting *Restatement of Torts* § 12 cmt. *a* (1934)); *Restatement (Second) of Torts* § 12.  *See Landlord's Liability for Injury or Death of Tenant's Child from Lead Paint Poisoning,* 19 A.L.R.5th at 418–24.

As stated, *supra,* in *Brown v. Dermer,* the "reason to know" test is the first test that a plaintiff alleging lead poisoning caused by a landlord's failure to correct a defective condition in a leased dwelling must meet.  We stated in *Brown,* 357 Md. at 362, 744 A.2d at 57, that "[u]nder this test, a plaintiff must present evidence that establishes that the landlord knew or had reason to know of a condition on the premises posing an unreasonable risk of physical harm to persons in the premises."  We also stated that "all that a plaintiff must show in order to satisfy the reason to know element is that there was

flaking, loose or peeling paint and that the defendant had notice of that condition." *Id.*

Looking at the facts, in a light most favorable to petitioners, in the case *sub judice,* petitioners have satisfied the "reason to know" test. It was established in the deposition of Sidney C. Caplan [22] that Mr. Caplan first became aware of the hazards of lead-based paint in approximately 1980, when he received a violation notice from the Baltimore City Health Department for a different property that was being managed by Consumer Management. Mr. Caplan stated in a deposition that he "learned that lead paint was hazardous when it was flaking, chipping, and peeling." Consumer Management, pursuant to contracts with landlords, on behalf of landlords, provides various services, including handling all leasing arrangements with tenants and arranging for repairs to the properties it manages. Consumer Management was managing the property at 1229 North Central Avenue when it, on behalf of the landlords, leased the premises to petitioners and they moved in and Consumer Management continued to manage the property after it was obtained by Mr. Hanson.[23] Mr. Caplan also testified, in his deposition, that if tenants of properties managed by Consumer Management called a phone number located on the rental application, the person who answered the phone, an employee of Consumer Management, was authorized to accept complaints and authorize repairs.

22. Mr. Caplan is a fifty percent stockholder in Consumer Management and is still active in the daily operation of the company. He testified at his deposition that he was a corporate representative of Consumer Management and that he is one of the officers of the corporation.

23. There is some question as to whether Consumer Management or BBG Management managed the property when it was first obtained by Mr. Hanson. Mr. Hanson did not provide any records to show that BBG Management ever managed the property and Mr. Caplan testified that he continued to manage the property after it was sold to Mr. Hanson. In his deposition, Mr. Hanson also stated that the property was managed by Consumer Management. Taking the facts with the best inferences for petitioners, we assume that Consumer Management managed the property for both the Ben–Ezras and Mr. Hanson.

Ms. Holmes testified in her deposition that the first time she called Consumer Management was approximately one month prior to her childrens' testing positive for elevated levels of lead in their blood.[24] Her deposition testimony was:

Q. The time that you asked for paint, that was after your kids had tested for lead paint poisoning?

A. No. I asked for that before my children were tested for lead.

Q. You mentioned that that was about a month before, is that correct?

A. Yes.

Ms. Holmes also testified in her deposition that she later called Consumer Management after her children tested positive for lead poisoning. She testified that "[w]hen I called her, I told her my children had lead. She said she don't know how the children got it. I said they get tested from the clinic. That is how I knew my children had it. That is when I called the Health Department."

Mr. Holmes testified at his deposition that he resided with Ms. Holmes in 1985–87, when Ms. Holmes was making the calls to the landlord and her children first tested positive for lead poisoning. Mr. Holmes testified that a man came to the row house to paint during this time. Mr. Holmes testified:

Q. Where were you when you were talking to him?

A. At the door.

Q. Why was he there?

A. Why was he coming there?

Q. Yes.

A. He was coming there to paint, he said.

Q. Did he identify himself?

A. He just said that he was from maintenance, that is all. He was going to paint.

**24.** As stated, *supra*, the children first tested positive for elevated levels of lead in their blood on October 17, 1986.

Q.  He said that he was from maintenance and he was going to paint?

A.  Yes, that is all.

Q.  What year did he come and have this conversation with you?

A.  I don't know, about '80 something, '86, '87.

Looking at the facts in their totality, and the reasonable inferences therefrom, and in the light most favorable to petitioners, the "reason to know" test might be satisfied. Consumer Management, as the landlord's agent, managed the property at 1229 North Central Avenue for both the Ben–Ezras and Mr. Hanson. Consumer Management had general knowledge of the hazards of lead-based paint and was authorized to arrange for repairs for the landlords. The employees of Consumer Management who answered the phone were authorized to accept complaints and to authorize repairs. Ms. Holmes called, on two occasions, once to request paint and then to report to the landlord that her children had tested positive for lead poisoning. Mr. Holmes testified that around this time, a man appeared at the row house stating that he was from maintenance and was there to paint. The man from maintenance then proceeded to scrape a wall with peeling paint before leaving.

In *Brown*, 357 Md. at 367, 744 A.2d at 60, we held that petitioners' allegations that they had made a complaint to the landlords about the deteriorating condition of the paint and the respondents denying receiving the notice of the condition, was a genuine dispute of material fact and satisfied the "reason to know" test. Examining the facts and the inferences in the present case in the light most favorable to petitioners, the man from maintenance was sent to the row house by Consumer Management because Ms. Holmes two phone calls had notified Consumer Management that there was a problem with the paint at 1229 North Central Avenue. An inference could be made by a trier of fact that the man from maintenance saw the paint peeling on the wall; of course, a trier of fact could also decide not to make such an

inference.[25]   Regardless, whether to make such an inference, under the circumstances of the case, was for the trier of fact, not the court.   Consumer Management, with its knowledge of the dangers of lead-based paint, would have been on notice that if there was a problem with the paint, it might pose a risk of physical harm to the children on the premises.   Consumer Management's notice is attributable to the landlords, as Consumer Management was apparently authorized to act for the landlords when it came to making repairs.[26]   As we have said, inferences might be made by a jury that petitioners had peeling paint in their row house and Consumer Management had notice of the condition through Ms. Holmes' phone calls and the man from maintenance seeing the peeling paint. Consumer Management, with their knowledge of lead-based paint, might have known the reasonable risk of physical harm to the petitioners.   Petitioners may have passed the "reason to know" test.   Whether they passed the test, under these circumstances, was for the trier of fact, not the court.   There was a genuine dispute of material facts as to whether Consumer Management had notice.

■■■   The second part of the test, that we enunciated in *Brown v. Dermer,* is for petitioners to present facts that establish that a landlord of ordinary intelligence with the same knowledge, should realize the risk of lead poisoning.   In *Brown,* 357 Md. at 367–68, 744 A.2d at 60–61, in finding that the second part of the test was satisfied, we stated that:

The lead poisoning injury alleged here is within the range of reasonable anticipation and probability. . . .   Under these circumstances, we hold that a jury could find that a reason-

**25.**  An inference could also be made that Ms. Holmes' phone calls had given Consumer Management notice of the flaking or peeling paint and that the man from maintenance was there to cure the problem, which he failed to do.

**26.**  Philip Hanson purchased the property in March of 1987.  There was evidence indicating that Consumer Management managed the property for Hanson.  Consumer Management's knowledge is thus imputed to Hanson.  On at least two occasions after Hanson purchased the property, tests on the two children indicated further elevated levels of lead.

ably prudent landlord would realize, after receiving notice, that flaking, loose or peeling paint presents an unsafe or dangerous condition and thus would investigate and correct the condition.

In *Richwind Joint Venture 4 v. Brunson*, 335 Md. 661, 645 A.2d 1147 (1994), we stated that:

> Based on the evidence presented, however, the jury in the instant case could have found that Scoken [27] received actual notice of peeling paint on the premises and also, because of Chodak's knowledge about older homes often containing lead-based paint, knew or had reason to know that the peeling paint in this house was lead-based. Upon obtaining that knowledge, the landlords knew the risk peeling lead-based paint represented to the tenant's children.

*Id.* at 679, 645 A.2d at 1156.

In the case *sub judice*, based on the facts that, at least inferentially, provided respondents with notice and Consumer Management's expertise and knowledge of the dangers of lead-based paint, stated, *supra*, an inference could have, although not necessarily would have, been made by the trier of fact that it was reasonably foreseeable and probable that once Consumer Management received the notification, it would have realized the risk of lead poisoning in Ms. Holmes' children. This would satisfy the second part of the *Brown v. Dermer* test. The inferences to be made were for the trier of fact. The respondents' motions for summary judgment should have been denied.

## Conclusion

We hold that the trial court and the Court of Special Appeals improperly applied the facts of the case *sub judice* in deciding whether to grant respondents' Motions for Summary Judgment. Examining the facts, including all inferences, in the light most favorable to the nonmoving party, petitioners

---

27. Scoken Management Corporation was hired to manage the property that was part of the suit in *Richwind*. Mark Chodak was the president of Scoken Management Corporation.

might have satisfied the two-prong test that this Court enunciated in *Brown*. There were issues of material fact that needed to be resolved by a trier of fact, not on motions for summary judgment.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS IS REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AND TO REMAND THE CASE TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENTS.**

Concurring Opinion by RAKER, J., in which ELDRIDGE, J., joins.

RAKER, Judge, concurring.

I join in the opinion of the Court with the exception of footnote 4.

The Court has inappropriately exercised the role of Bar Counsel and circumvented the procedures set forth in Maryland Rules 16–701 through 16–718 relating to the attorney grievance process. While I do not defend the conduct of Petitioner's counsel, I believe that he should have had notice of the complaint against him and the opportunity, in the appropriate forum, to defend himself. This Court should not act as Bar Counsel, hearing judge, and adjudicator.

Judge ELDRIDGE has authorized me to state that he joins in the views expressed herein.