750 A.2d 638

**Antonio JONES, et al.**

v.

**MID–ATLANTIC FUNDING COMPANY, et al.**

**No. 6766, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

April 27, 2000.

Alan J. Mensh (Saul E. Kerpelman, on the brief), Baltimore, for appellants.

Angus R. Everton, Hunt Valley, for appellee, Consumer Management Corp.

Una M. Perez (David A. Carter and Meyers, Billingsley, Rodbell & Rosenbaum, P.A., on the brief), Annapolis, for appellees, Peter and Julia Ben Erza.

Natalie C. Magdeburger (Whiteford, Taylor & Preston, LLP, on the brief), Towson, for appellee, Hanson.

Argued before SALMON, THIEME and THEODORE G. BLOOM (Ret., Specially Assigned), JJ.

SALMON, Judge.

This is a lead paint poisoning negligence action instituted by Carrie Holmes on her own behalf and on behalf of her two children, Antonio Jones, born August 1, 1983, and Erica Jones, born November 1, 1985. Ms. Holmes contends that her

children contracted lead poisoning as a result of living at 1229 North Central Avenue, Baltimore City, Maryland (the "Premises"). Ms. Holmes rented the Premises commencing in May 1984 and lived there with her children until 1990.

Ms. Holmes's landlords between May 1984 and March 1, 1987, were Peter and Julia Ben Ezra ("the Ben Ezras"). From March 1987 until she vacated the Premises in 1990, her landlord was Phillip Hanson ("Hanson"). Consumer Management Corporation managed the Premises for both the Ben Ezras and Hanson at all times here relevant.[1]

On May 5, 1994, Carrie Holmes filed a complaint in the Circuit Court for Baltimore City against Hanson and others, alleging, *inter alia*, that the defendants had been negligent in the upkeep of the Premises, causing injuries to Erica and Antonio.[2] Subsequently the complaint was amended to allege negligence against the Ben Ezras and Consumer Management Corporation.

After engaging in substantial discovery, Hanson, the Ben Ezras, and Consumer Management Corporation each filed a motion for summary judgment. The motion filed by Consumer Management Corporation was initially denied; however, Consumer Management subsequently filed a motion to alter or amend judgment. In October of 1997, Baltimore City Circuit Court Judge John Carroll Byrnes granted the motion for summary judgment filed by Hanson and the Ben Ezras. Shortly thereafter, he granted Consumer Management's mo-

---

**1.** Phillip Hanson said in his deposition that Consumer Management Corporation managed the property for him starting at the time that he purchased the property in March of 1987. Later, he filed an affidavit saying that "Consumer Management was not the managing company for me when I first purchased the property. Instead BBG Realty was my managing company." Because we are required to take the evidence in the light most favorable to the plaintiffs/appellants, we have assumed, for the purposes of this appeal, that Consumer Management Corporation was always the agent for Phillip Hanson.

**2.** The complaint also alleged that the defendants had violated the Consumer Protection Act and that they were liable under the theory of "strict liability." In this appeal, appellants contend only that the trial judge erred in granting summary judgment as to the negligence count.

tion to alter or amend judgment and granted summary judgment in its favor. Plaintiffs then filed their own motion to alter or amend judgment, which was denied. The plaintiffs next dismissed a party who had been named as a defendant and served. After the dismissal, the plaintiffs noted this timely appeal and present us with two questions:

1. Did the trial court err in granting the motions for summary judgment filed by Consumer Management Corporation, Hanson, and Ben Ezras?

2. Did the trial court err in denying a motion to alter or amend judgment filed by the appellants?

Although appellants raised two issues, they present argument in their brief only as to the first. Therefore, the second issue shall be deemed waived. *See Beck v. Mangels*, 100 Md.App. 144, 149, 640 A.2d 236 (1994); Md. Rule 8–504(a)(5) ("[A] brief shall contain ... [a]rgument in support of the party's position.").

## I. BACKGROUND FACTS

The facts that are necessary to dispose of this case all concern the issue of whether the appellees ever received notice that the leased Premises contained deteriorated (i.e., cracking, loose, peeling, or flaking) paint. As will be shown *infra*, if they received no such notice, all of the appellees were entitled to a grant of summary judgment in their favor. In regard to the notice issue, appellants relied in the trial court primarily on the deposition testimony of Carrie Holmes and her brother, Harry Holmes.

### A. DEPOSITION TESTIMONY OF CARRIE HOLMES

Ms. Holmes testified that, in addition to her two children, her brother, Harry Holmes, came to live with her at the subject property for approximately two years. Although she was not sure of the exact dates, she believed that he commenced his residency with her in 1984, shortly after he received his discharge from the U.S. Army, and stayed until sometime in 1986.

Before she moved into the Premises, Ms. Holmes inspected the home and found it to be in "fair" condition with "no chipped paint, no nothing."[3] In her words, the house "was already painted nice and clean all the way through."

The Premises consisted of a two-story, three-bedroom row house located on the east side of Baltimore. During her tenancy, Ms. Holmes "put all [of her] children in the middle room, because somebody kept breaking [into her] house, and [she] got scared."

Ms. Holmes did not notice any problem with defective paint until one month before her children were diagnosed with having elevated lead levels; that diagnosis was made on October 17, 1986.[4] She admitted that she never reported to her landlords or to their agents that there was loose, chipping, flaking, or peeling paint on the Premises. Specifically, she testified as follows:

Q: Did you ever tell anyone at your land-lord's about the problems with the paint?

A: No.

Q: I am asking at any time?

A: No.

Sometime in September 1996, Ms. Holmes contacted Consumer Management Corporation to ask for paint. She did not say why she wanted the paint. On that occasion, Ms. Holmes talked to a secretary at the management company who said that they "don't give out paint." The secretary did not

---

3. Repair slips that were introduced into evidence show that on April 24, 1984, which was before Ms. Holmes rented the Premises, the house was painted and plastered throughout.

4. On October 17, 1986, Antonio had a blood lead level of 37ug/dL (an elevated blood lead level is considered any level above 10 ug/dL). This level slightly decreased to 33 ug/dL on December 10, 1986, and 34 ug/dL on January 20, 1987. The lead poisoning levels then began to increase to 38 ug/dL on April 2, 1987. Almost a year later the blood lead level was still elevated and measured 32 ug/dL. Then, on July 25, 1988, the blood lead level sharply increased to 62 ug/dL. The most recent blood lead level measurement of 41 ug/dL was made on October 5, 1988.

promise to send someone to paint the house, nor did Ms. Holmes ever paint the house on her own.

Shortly after she was notified that her children were diagnosed as having lead paint poisoning, Ms. Holmes talked to "a lady," otherwise unidentified, at the management company's office. Ms. Holmes's deposition testimony in regard to this conversation was as follows:

Q: After the children were tested for lead paint poisoning for the first time in '86, that is when you called the landlord, correct?

A: Yes.

Q: What did you say to the landlord?

A: That my clinic found, the doctor just found out my children had lead. He said he don't know how they got it. I called the Health Department.

Q: Do you remember who you talked to?

A: Somebody on the phone.

Q: Do you know if it was the middle-aged man that you talked to before?

A: They say that he had been deceased.

Q: Was it a man or a woman that you spoke to?

A: I think it was a lady.

Q: Do you remember her name?

A: No.

Q: Did you speak to anyone else other than her?

A: No, ma'am.

Q: Did you speak to anyone, or did you speak to her other than that one time, or was it just that once?

A: Just that one time.

Q: What did she say to you?

A: When I called for, I told her my children had lead. She said she don't know how the children got it. I said they get tested at the clinic. That is how I knew my children have it. That is when I called the health department.

Q: Did you say anything else to the lady at that time?

A: No.

Ms. Holmes called the Baltimore City Health Department (the "Health Department") to complain about the Premises. The exact date she did this is not shown in the record. The record does show that on June 24, 1987, H.L. Burley of the Health Department inspected the Premises and found thirty-three areas that tested positive for lead-based paint. Mr. Burley also noted that some of these areas contained flaking or chipping paint. Ms. Holmes was given an information sheet by Mr. Burley that set forth his findings. The following day, she took the information sheet to her attorney, Saul Kerpelman, and asked him to send it to the landlord.

## B. DEPOSITION TESTIMONY OF HARRY HOLMES

Harry Holmes ("Holmes") could not recall the exact dates when he resided at the Premises. Nevertheless, he remembered that he lived with Ms. Holmes and her children "off and on [for] ... four or five years maybe." When questioned further, Holmes stated: "In the Eighties, that is all that I know, but the specific time and date I don't know.... Maybe it was '86, '87, in the Eighties."

Holmes testified that when he first moved into the subject property, the window sills had peeling paint and, overall, the Premises looked to him like a "shack." The house, which was cold, contained holes in the walls, required stucco, sanding, and new doors and windows. The windows needed caulking and there was a "plumbing problem in the bathroom."

Holmes recalled that about one year after he moved into the Premises, a stranger came to the row house and said he was there "to paint." The man did not tell Holmes his name or provide any identification. In Holmes's words, "[he] just said that he was from maintenance, that is all. He was going to paint." The stranger looked to Holmes like a "five and dime drunk off the street" and he "looked and smelled like a drunk." Holmes further described the man as looking "like a street person, corner guy, like the landlords know him, like somebody on the corner."

This inebriated stranger never actually did any painting; instead he merely scraped the walls in the kitchen and left after approximately one hour. The man never returned to paint. Holmes did not check with anyone to verify that the man was in fact sent by the landlord.

Holmes further testified at his deposition that he overheard Ms. Holmes contact the landlord on about six different occasions while he resided with her. His testimony concerning these calls was as follows:

Q: Do you know if any of the problems with the plumbing, or the windows, or the door were reported to the landlord?

A: Yes.

Q: How do you know they were reported?

A: Because she reported it, I believe.

Q: How do you know?

A: I believe, when we were sitting there, she called, I know she called from my mother's house, I know she called from her house.

I know that she called from the corner store. You go across the street from the corner store, and you call. That is where you make your calls from.

. . .

Q: So there were three occasions that you heard your sister report problems to the landlord?

A: No, there were quite a few occasions she called.

Q: How many times did she call the landlord?

A: Personally you think—how many times do I think she called?

Q: No. How many times do you know she did? How many times did you see or hear her report?

A: About six times that I know.

In regard to his knowledge of the content of his sister's conversations with the landlord, the questions to Holmes and his answers were:

Q: Did you hear the conversation? Did you overhear them?

A: No, I went to the telephone with her at the corner telephone.

Q: Could you hear what she was saying?

A: No, ma'am.

### C. OTHER EVIDENCE

On February 25, 1988, the Health Department sent a two-page lead paint violation notice to Hanson. Since the violation notice was sent to the Premises instead of to Hanson's residence or business, the letter was returned to the Health Department unopened with a stamped notation indicating that the addressee was unknown. So far as the record shows, Ms. Holmes's attorney never notified the appellees of what the Health Department had found when it inspected the premises on June 24, 1987.

### II. STANDARD OF REVIEW

■ A trial court may grant summary judgment only if "the motion and response show that there is no genuine dispute as to any material fact and the party in whose favor judgement is entered is entitled to judgment as a matter of law." Md. Rule 2–501(e). In reviewing a summary judgment motion, the trial court must consider the facts, and any reasonable inferences drawn from those facts, in the light most favorable to the non-moving party. *See Dobbins v. Washington Suburban Sanitary Comm'n,* 338 Md. 341, 345, 658 A.2d 675 (1995); *Richman v. FWB Bank,* 122 Md.App. 110, 146, 712 A.2d 41 (1998), *aff'd, FWB Bank v. Richman,* 354 Md. 472, 731 A.2d 916 (1999).

■ The non-moving party must establish that a genuine dispute exists as to a material fact by proffering facts that would be admissible in evidence in order to defeat a motion for summary judgment. *See A.J. Decoster Co. v. Westinghouse Elec. Corp.,* 333 Md. 245, 261, 634 A.2d 1330 (1994); *Moura v.*

*Randall,* 119 Md.App. 632, 640, 705 A.2d 334 (1998). Hence, mere general allegations that do not show facts in detail and with precision are insufficient to prevent the grant of summary judgment. *Beatty v. Trailmaster,* 330 Md. 726, 738, 625 A.2d 1005 (1993). The trial court, however, will not resolve disputed issues of fact at the summary judgment stage, because the court is concerned primarily with whether a dispute of material fact exists. *DeBusk v. Johns Hopkins Hosp.,* 105 Md.App. 96, 102, 658 A.2d 1147 (1995).

■ The appellate court determines whether there is a genuine issue of material fact and whether the trial court was legally correct. *See Decoster,* 333 Md. at 261, 634 A.2d 1330; *Richman,* 122 Md.App. at 147, 712 A.2d 41; *Woodward v. Newstein,* 37 Md.App. 285, 290, 377 A.2d 535 (1977).

## III. DISCUSSION

### A. ISSUE I

■ The pivotal issue here is whether the appellees received notice sufficient to hold them liable for their failure to abate the lead-based paint hazard present at the Premises. Appellants argue that the evidence adduced during discovery supports the conclusion that the landlords and the management company either actually knew or should have known of the existence of a defective paint problem at the Premises.

> In a lead paint poisoning claim based on negligence, a plaintiff must identify admissible evidence that, if believed, would prove that the landlord ... had actual knowledge or reason to know of chipping, peeling, and flaking lead paint on the premises....

*Brown v. Wheeler,* 109 Md.App. 710, 718, 675 A.2d 1032 (1996) (citing *Richwind Joint Venture 4 v. Brunson,* 335 Md. 661, 673–676, 645 A.2d 1147 (1994); *Bartholomee v. Casey,* 103 Md.App. 34, 53, 651 A.2d 908 (1994)) (internal citations omitted).

The Court of Appeals has defined the term "reason to know" as follows:

Both the expression "reason to know" and "should know" are used with respect to existent facts. These two phrases, however, differ in that "reason to know" implies no duty of knowledge on the part of the actor whereas "should know" implies that the actor owes another the duty of ascertaining the fact in question. "Reason to know" means that the actor has knowledge of facts from which a reasonable man of ordinary intelligence or one of the superior intelligence of the actor would either infer the existence of the fact in question or would regard its existence as so highly probable that his conduct would be predicated upon the assumption that the fact did exist. "Should know" indicates that the actor is under a duty to another to use reasonable diligence to ascertain the existence or non-existence of the fact in question and that he would ascertain the existence thereof in the proper performance of that duty.

*State v. Feldstein,* 207 Md. 20, 33, 113 A.2d 100 (1955) (quoting Restatement of Torts § 12 cmt. a (1934)); *see also Richwind,* 335 Md. at 677, 645 A.2d 1147.

██ If there is no proof that appellees either knew or had reason to know of chipping, loose, peeling, or flaking lead paint at the Premises prior to the date the children vacated the Premises, the trial court's grant of summary judgment would be proper. *Brown v. Dermer,* 357 Md. 344, 365, 744 A.2d 47 (2000). Thus, if appellees were unaware of the deteriorated lead paint condition on the Premises, their knowledge of the danger that such a condition might create is irrelevant. Moreover, without the requisite notice, appellees could not have had a reasonable opportunity to remedy the problem.

Appellants claim that the depositions of Ms. Holmes and Harry Holmes contain testimony sufficient to show circumstantially that each of the appellees had knowledge of deteriorated paint.

Appellants maintain that Carrie Holmes's call to the management company requesting paint was sufficient to alert the Consumer Management Corporation and the landlord of the defective condition. This argument is without merit. As Ms.

Holmes described this call in her deposition, she could have been requesting paint for numerous reasons, none of which would lead the appellees to infer that the Premises contained deteriorated paint. For example, Ms. Holmes may have wanted to repaint her home in order to cover stains or to alter the color scheme. According to her deposition testimony, Ms. Holmes did not inform the agent of Consumer Management Corporation with whom she spoke that she needed new paint because her existing paint was either chipping, loose, flaking, or peeling. Without information in addition to a mere request for paint, the management company had no way of knowing that the existing paint (which, at most, was three years old) had deteriorated.

Likewise, Consumer Management Corporation's knowledge that the children had developed lead poisoning did not give the management company reason to know of deteriorated paint at the Premises. Ms. Holmes did not accuse the landlord of having been the cause of the poisoning and Consumer Management Corporation could not be expected to infer that the Premises contained deteriorated paint from the fact that the children had been poisoned by lead paint. The children could have contracted lead paint poisoning from any number of locations other than the Premises: for example, from lead paint at their playground or in the homes of friends, neighbors, or relatives.

While there was a notice of lead paint violations from the Health Department that was sent to Hanson, that notice was mailed to him at an incorrect address. There was no evidence that Hanson received any actual notice. Likewise, there is no evidence that counsel for appellants ever sent the information sheet prepared by Mr. Burley to the landlord(s), though he was asked to do so by Ms. Holmes. In short, there is nothing in the record to indicate that appellees were ever notified of the Health Department's inspection or that they received a copy of the violation notice before appellants vacated the Premises.

Appellants contend that their proof was sufficient to show that the drunk man who came to the Premises to paint was

the agent of Consumer Management Corporation. Moreover, according to appellants, notice of deteriorated paint received by that agent was sufficient to place all appellees on notice.

■ "[T]he law in this state is well settled that in the absence of independent proof of facts from which agency may be inferred, the existence of agency cannot be proved by the unsworn declarations of the agent." *Tregellas v. American Oil Co.*, 231 Md. 95, 102, 188 A.2d 691 (1963). It is true that the drunk man did tell Holmes that he was "from maintenance," but there was no evidence to corroborate that representation. More specifically, there was no testimony that either Ms. Holmes or her brother had requested that their home be painted prior to the time of the visit from the man "from maintenance." In addition, there was no indication that any of the appellees had sent a painter to the Premises. Possibly the drunk stranger pretended to be "from maintenance" in order to gain entry into the home to later burglarize it, given Ms. Holmes's testimony that the Premises had been broken into on numerous occasions. Because agency was not proven, whatever knowledge the inebriated man may have gained concerning the condition of the paint at the Premises cannot be imputed to the appellees.

In sum, appellants failed to produce evidence sufficient to prove that appellees knew or should have known of deteriorated paint at the Premises, and therefore, the trial judge was legally correct when he granted summary judgment in favor of the appellees.

## B. ISSUE II

■ As stated above, appellants have waived the argument that the trial court erred in denying the motion to alter or amend by failing to argue this issue in their brief. *See Beck*, 100 Md.App. at 149, 640 A.2d 236. Nonetheless, even if appellants had preserved this issue, any argument that it was error to deny the motion to alter or amend would have failed.

With one major exception, appellants' motion to alter or amend judgment was based on the same evidence as their

opposition to the motion for summary judgment. Appellants attached to their motion a copy of an interrogatory directed to Ms. Holmes and her answer to that interrogatory. The addition read:

> *Interrogatory No. 23:* If you or anyone acting on your behalf ever requested any of the [d]efendants named in your [c]omplaint that any painting, plastering and/or wallpapering be done on the premises known as 1229 North Central Avenue, Baltimore, Maryland, state the details of each such request including, but not limited to the identity of the individual receiving such request, the purpose of which the paint, plaster and/or wallpaper was to be used, the purpose for which the materials were in fact used, the date on which each such request was made, the date(s) in which the paint, plaster and/or wallpaper was obtained and the date on which such painting, plastering and/or wallpapering was performed.

> *Answer:* Both before and after my children were diagnosed with elevated lead levels I had requested that the landlord take care of the flaking and chipping paint. I had complained about the flaking paint numerous times before the Health Department came to the house and found lead. The landlord knew that the house contained lead paint, was issued a violation notice, and still did not repair the conditions while we were living in the house after the violation notice had been issued.

In *Pittman v. Atlantic Realty Co.,* 127 Md.App. 255, 267–68, 732 A.2d 912 (1999), we held that a party cannot defeat summary judgment by contradicting (through the use of an affidavit) unambiguous deposition testimony. Ms. Holmes unequivocally stated in her deposition that she never told anyone at the landlord's office about problems with the paint. The question here is whether a sworn interrogatory answer that contradicts deposition testimony constitutes sufficient "new evidence" to compel a trial judge to alter or amend a prior order granting summary judgment.

The standard employed in reviewing the denial of a motion to alter or amend judgment is whether the lower court

abused its discretion. *See Friends of the Ridge v. Baltimore Gas & Elec. Co.,* 120 Md.App. 444, 490, 707 A.2d 866 (1998).

[Abuse of discretion] has been said to occur where no reasonable person would take the view adopted by the [trial] court, or when the court acts without reference to any guiding rules or principles. It has also been said to exist when the ruling under consideration appears to have been made on untenable grounds, when the ruling is clearly against the logic and effect of facts and inferences before the court, when the ruling is clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result, when the ruling is violative of fact and logic, or when it constitutes an untenable judicial act that defies reason and works an injustice.

*Id.* at 490–91, 707 A.2d 866 (quoting *North v. North,* 102 Md.App. 1, 13–14, 648 A.2d 1025 (1994)) (internal quotations omitted) (alterations in original). Given the extremely broad discretion accorded to trial judges called upon to review Rule 2–534 motions, and in light of our holding in *Pittman,* the trial court clearly did not abuse its discretion in denying the motion to alter or amend judgment in the case.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANTS.**