769 A.2d 1025

**Herby HELMAN**

v.

**Ira MENDELSON et al.**

**No. 512, Sept. Term, 2000.**

Court of Special Appeals of Maryland.

April 10, 2001.

Albert Brault, Rockville (David J. Cynamon, Maureen B. Beahn, Gerard M. Babendreier and Shaw Pittman, on the brief), Washington, DC, for appellant.

Brian L. Schwalb (Burton A. Schwalb and Schwalb, Donnefeld & Schwalb, PC, on the brief), Washington, DC, for appellees.

Argued before KENNEY, ROBERT L. KARWACKI, (Ret'd, specially assigned) and CHARLES E. MOYLAN, Jr. (Ret'd, specially assigned), JJ.

KENNEY, Judge.

This case arises out of a grant of summary judgment by the Circuit Court for Montgomery County in favor of appellees,

Ira Mendelson ("Ira"), Herlene Nagler ("Herlene"), and David Luftig ("David"), to two suits, consolidated below, filed by appellant, Herby Helman. Appellant presents three questions on appeal, which we have renumbered:

1. Whether the trial court abused its discretion when it excluded the report of Mr. Helman's expert, Charles Lundelius, which exclusion resulted in the grant of summary judgment in favor of Appellees on Mr. Helman's claim that the trustees of the Alfred G. Mendelson Trust breached their fiduciary duty by improperly investing the assets of the Alfred G. Mendelson Trust.

2. Whether the trial court incorrectly held that there was no genuine issue of material fact and that Appellees were entitled to judgment as a matter of law on Mr. Helman's claim that the loans made by the trustees of the Alfred G. Mendelson Trust to themselves and Mendelson family members and friends constitute a breach of fiduciary duty.

3. Whether the trial court abused its discretion when it denied Mr. Helman's motion to alter or amend the Order that granted summary judgment in favor of Appellees.

Answering all questions in the negative, we will affirm.

## Factual Background

Alfred G. Mendelson ("Alfred"), appellant's grandfather, died in 1972. Alfred created a testamentary trust, the Alfred G. Mendelson Trust ("AGM Trust"), pursuant to which his wife, Ida Mendleson ("Ida"), was the income beneficiary, and his two children, Murry Mendelson ("Murry") and Sandra Helman ("Sandra"), were the remainder beneficiaries. Murry had two children, Ira and Herlene. Sandra had two children, Gloria Helman ("Gloria") and appellant.

If Murry or Sandra predeceased Ida, their children (or their grandchildren, if the children were deceased) would take the remainder, except that if Sandra predeceased Ida, appellant's *per stirpes* share was to be placed into a trust identified as the

Herby Helman Trust ("HH Trust").[1] Murry and Ida were also the designated trustees of the AGM Trust.

In 1981, Sandra and Gloria sold all of their ownership interests in the closely held family business, Murry's Steaks, Inc.("Murry's Steak"), back to the company. They also agreed to sell their interests in the AGM Trust to Murry's Steaks at some future time. Pursuant to the agreement with Gloria, her contingent remainder interest was worth $665,000, and she agreed to sell her interest if her mother predeceased her. Sandra died in January 1985, and, later that year, the purchase of Gloria's 25% interest in the AGM Trust was completed. The alternate purchasers were the three remaining contingent remainder beneficiaries, Ira, Herlene, and appellant. Each were required to pay $221,667 for one-third of Gloria's 25% interest in the trust. To take advantage of this opportunity, and, as Ida wished, each of them were loaned the $221,667 from the AGM Trust to effectuate the purchase. Each signed a promissory note to the Trust, but Ida paid appellant's interest on the note as a gift.[2]

As a result, after Sandra's death, Ira and Herlene each owned a 25% contingent remainder beneficiary interest in the AGM Trust through their father in addition to an 8⅓% remainder interest in the AGM Trust from their purchase of one-third of Gloria's share. On Ida's death, appellant would own outright 8⅓% of Gloria's remainder interest in the AGM Trust; his original 25% remainder interest would be placed into the HH Trust.

During her life, Ida was very generous, giving large sums of money to her grandchildren and great-grandchildren as gifts.

---

**1.** Appellant indicated that he had had a number of problems as a child. He stated he was "very hyperactive, I was a slow learner, I was very belligerent and very hard to deal with as a child." He believed that Alfred's concerns led to the creation of the HH Trust.

**2.** It appears that Ira and Herlene took responsibility for paying their own interest and principal on the note. Appellant's principal was deducted from the amount remitted to him when the corpus was distributed.

These gifts were drawn on an account entitled "Ida Mendelson Trust C," a revocable *inter vivos* trust set up to receive the income from the AGM Trust. Appellant was aware that the gifts came from this account, and he had asked Murry about it. Murry advised that "Ida Mendelson Trust C" was the name of the account but apparently provided no detailed explanation regarding its origin or its funding.

During the life of the AGM Trust, the corpus grew from approximately $420,000, the value of the stock in Murry's Steaks at the time of Alfred's death, to approximately $22 million. In the interim, Murry's Steaks had been sold to Rymer, Inc. for $57 million. This resulted in a large influx of cash into the AGM Trust after taxes were paid on the sale. Murry's Steaks was bought back in 1989 through a bank loan in addition to loans from Murry and Ida; the AGM Trust did not pay any of the costs of repurchase. The company is now known as Murry's, Inc.

In 1989, Ida, who no longer wished to be a co-trustee of the AGM Trust, resigned and Ira took over in her place.[3] After Ida died on May 28, 1996, Murry and Ira then began serving as trustees of the now funded HH Trust.

Appellant contested Ida's will, which was probated in the Circuit Court for Palm Beach County, Florida, where she lived at the time of her death. Murry was the designated personal representative of Ida's estate. Appellant alleged that Ida lacked testamentary capacity and accused Murry of exerting undue influence on her in an effort to reduce the amount she left appellant in her will. Appellant apparently believed that he was entitled to one-fourth of Ida's $10 million estate. Appellant settled that litigation on the eve of trial for a "relatively small amount".

---

**3.** The trust instrument named Sandra as the first alternate trustee and an accountant, Irvin Rubin, as second alternate trustee. At the time Ira took over as trustee, Sandra had sold her interest in the trust and was apparently uninvolved with the family. It is unclear why Irvin Rubin was unavailable to be a second alternate trustee, thus necessitating Ira's involvement.

During the course of the will contest, appellant began complaining about the handling of the AGM Trust. He insisted that the corpus did not grow as much as he thought it should have and that the assets were allocated in a manner to provide the maximum benefit to the income beneficiary to the detriment of the remainder beneficiaries because the trustees invested primarily in fixed income securities such as bonds and notes rather than investing in the stock market. Appellant also argued that the trustees made improper loans to family members and engaged in other behavior appellant viewed as "self-dealing."

Murry died in 1998, and David replaced him as trustee for the HH Trust. Ira and Herlene were named as the co-personal representatives of Murry's estate. Between the time of Murry's death and the filing of the present litigation, appellant was making demands for increasing amounts of money from the HH Trust. Although Ira and David granted some of these requests, they explained in letters to appellant that they also had a duty to the remainder beneficiaries of that trust, namely, appellant's children.

On January 13, 1999, appellant filed two suits in the Circuit Court for Montgomery County. The first suit was filed against Ira as co-trustee of the AGM Trust and co-personal representative of Murry's estate, Herlene as co-personal representative of Murry's estate, and David as trustee of the HH Trust. The suit claimed breach of fiduciary duty, requested an accounting, requested removal of both Ira and David as trustees of the HH Trust and the AGM Trust, and requested removal of both Ira and David as trustees of the HH Trust. The second suit requested that the circuit court assume jurisdiction over the HH Trust. In it, he claimed Ira breached his fiduciary duty with respect to the HH Trust by breaching various duties to the AGM Trust,[4] requested removal of both Ira and David as trustees of the HH Trust, and requested an

---

4. David had never been a trustee of the AGM Trust.

accounting. The two cases were consolidated by order of the court on April 29, 1999.

During the course of discovery, appellant requested several modifications of the discovery schedule, apparently revolving around the retention of an expert witness. In addition, appellant was not forthcoming with the information he intended to use to prove the allegations made in his complaints, apparently relying on his expert to provide him with whatever evidence he would need to prevail. Discovery in the case closed on November 24, 1999; appellant's December 9, 1999 request for a further extension was denied. Appellant did not provide appellees with his expert's report until January 26, 2000.

Appellees filed a motion for summary judgment on December 9, 1999. They argued that appellant had failed to "determine and disclose" the facts he intended to rely upon to support his claims, that the expert finally designated by appellant lacked the qualifications needed to be an expert in this case, and that appellant's claims were barred by both the doctrine of laches and the doctrine of equitable estoppel.

On January 14, 2000, appellant filed an amended complaint, dismissing David from the first complaint concerning management of the AGM Trust. That same day, appellant filed an amended petition in the case concerning the HH Trust that requested relief only with respect to Ira.

The court held a hearing on the motion for summary judgment on January 28, 2000. At that hearing, the court declined to accept the late-filed expert's report and granted appellees' motion for summary judgment. A written order, entered on February 1, 2000, effectively disposed of both of the original complaints.

Appellant filed a motion to amend or alter judgment on February 11, 2000. That motion was denied on March 28, 2000. This appeal followed and involves the claims of both original complaints.

## Discussion

### I. The Expert's Report

■ In his brief, appellant argues that the circuit court abused its discretion by excluding his expert's report. In order to fully discuss this issue, it would be useful to set forth what occurred during discovery.

The first scheduling order in this case was issued on April 21, 1999, and called for plaintiff's experts to be identified by June 28, 1999, defense experts to be identified by August 11, 1999, and discovery to be completed by October 25, 1999. That order also stated: "*ANY* MODIFICATIONS OF THIS SCHEDULING ORDER MUST BE REQUESTED BY WRITTEN MOTION AND FILED *BEFORE* THE COMPLIANCE DATE(S)." (Emphasis in original.)

On July 7, 1999, after the original deadline for appellant to identify his experts, appellant requested, and was granted, an extension of the time to identify his experts. Appellant was given until August 23, 1999, to identify his experts. On August 23, 1999, appellant identified Charles Lundelius ("Lundelius"), an accountant, as his expert.

On October 19, 1999, appellees deposed Lundelius. Lundelius indicated that his first meeting with appellant concerning the substance of the case had taken place on October 6, 1999. He also advised that he had not been officially retained, because appellant had not signed the engagement letter. Lundelius was unable to provide any opinion or even the methodologies he would use to render his opinion on the appropriateness of asset allocation in the AGM Trust: "We haven't even finished getting the data loaded into a spreadsheet so I can even look at the allocations that were made. So we haven't even started, essentially, in terms of the analysis." Appellees stopped the deposition in light of Lundelius' lack of knowledge of the specifics of the case. At that time, discovery was set to close on October 25, 1999, which left appellees with little or no time to confer with their own expert, redepose Lundelius, and prepare a defense.

On November 9, 1999, again after the original deadline, appellant requested, and received, with appellees' consent, a second extension of time until November 24, 1999, to complete discovery. The date passed without the submission of Lundelius' report.

On December 9, 1999, again contrary to the instructions in the original scheduling order, appellant filed an additional motion requesting, *inter alia,* that the close of discovery be delayed until February 10, 2000. That same day, appellees filed their motion for summary judgment. On December 20, 1999, appellant supplemented his motion to extend the discovery period with information that Lundelius was changing firms, which had resulted in a delay in the preparation of his report. On January 6, 2000, the court granted some of appellant's requests, although it declined to extend the time for the close of discovery. In this same order, the court scheduled a hearing on appellees' motion for summary judgment for January 26, 2000. Appellant does not dispute the trial court's refusal to extend the time for discovery.

The hearing on the motion for summary judgment actually took place on January 28, 2000. Two days prior, appellant had finally provided Lundelius' report to appellees, but he did not submit it to the court until February 11, 2000. The court, ruling from the bench, decided not to accept the late filed report:

> From a philosophical standpoint, I know what counsel is saying with respect to the enforcement of scheduling orders and the requirement that those scheduling orders be met in order to allow the cases to proceed in an orderly fashion.

> My view generally is such that if there is no compliance with the scheduling order, then I take a look at the prejudice that is being suffered by the parties seeking to enforce the terms of the scheduling order to the detriment of the party who has failed to comply with the scheduling order as part of my consideration in declining to allow a party to continue with discovery or to present evidence before the

Court that was not produced prior to the expiration of that day.

In this instance, it has been urged that this matter should be disposed of and the matter should be tried and the resolution of the issues should be reached, and summary judgment is not appropriate.

I generally do not feel that summary judgment is appropriate in cases of this nature because it does deny the parties an opportunity to finally resolve this case and to have a hearing on the merits.

\* \* \*

[T]he allegations of diversion of substantial assets of the trust to finance private loans to themselves and their families, the allegations that they have engaged in a pattern of self-dealing and asset manipulation which are contained within the plaintiff's complaint are serious allegations. And the trustees deserve to have this matter resolved. The trustees deserve to have this matter concluded.

And there is prejudice to the trustees by allowing this case to continue on and on and on in an open-ended sort of fashion to allow experts to say, "Well, I have not arrived at my opinion yet. I have not reached a conclusion yet, but I have a theory that the trust was not managed properly and, therefore, the trustee should be held responsible."

Well, there comes a point in time where the trustees deserve an answer to that. That point in time should have been reached at the time this lawsuit was filed, and these types of allegations and claims being made against trustees are serious allegations and claims.

And I understand what [appellant's attorney] is saying with respect to his evaluation and review of the evidence and the good faith basis for filing the lawsuit. But on the other hand, the trustees are entitled to have a resolution of this case, and that was why I denied the motion to extend discovery further.

And that is why I am not going to accept the late filing of the expert's report. It is clear to me from the evidence that I have before me that there is no fact in dispute that would allow this case to proceed against the trustees.

Appellant now argues that exclusion of the expert's report was a discovery sanction based upon appellant's failure to timely file the report. "The report's exclusion formed a substantial basis for the trial court's award of summary judgment to Appellees and dismissal of Mr. Helman's claims. Mr. Helman, therefore, has been denied a trial on the merits."

■■■ We review the exclusion of the report for abuse of discretion. *Massie v. State*, 349 Md. 834, 850–51, 709 A.2d 1316 (1998); *Commercial Union Ins. Co. v. Porter Hayden Co.*, 116 Md.App. 605, 641, 698 A.2d 1167 (1997), *cert. denied*, 348 Md. 205, 703 A.2d 147 (1997).

Under the approach taken by most courts, whether the exclusion of . . . testimony is an abuse of discretion turns on the facts of the particular case. Principal among the relevant factors which recur in the opinions are whether the disclosure violation was technical or substantial, the timing of the ultimate disclosure, the reason, if any, for the violation, the degree of prejudice to the parties respectively offering and opposing the evidence, whether any resulting prejudice might be cured by a postponement and, if so, the overall desirability of a continuance. Frequently these factors overlap. They do not lend themselves to a compartmental analysis.

*Shelton v. Kirson*, 119 Md.App. 325, 331, 705 A.2d 25, *cert. denied*, 349 Md. 236, 707 A.2d 1329 (1998) (quoting *Taliaferro v. State*, 295 Md. 376, 390–91, 456 A.2d 29 (1983)).

### 1. Substantial or Technical Violation

■■ This Court has previously held that, at some point, a failure to comply with a discovery deadline moves from technical to substantial. *Heineman v. Bright*, 124 Md.App. 1, 8–9, 720 A.2d 1182 (1998). In that case, the appellant was fighting a request by her late husband's estate to turn over some

bonds, to which she had waived her rights pursuant to a prenuptial agreement. Appellant's entire case, that she gained subsequent rights to the bonds, rested entirely on witness testimony. Despite this, she failed to identify witnesses within the discovery period and failed to provide any information regarding the relevant knowledge the witnesses might have. This Court found the appellant's noncompliance under these circumstances to be a substantial violation of the discovery rules. *Id.* at 9, 720 A.2d 1182.

Although the discovery period lasted two years in *Heineman* rather than the one year period in this case, we find *Heineman* instructive. In both cases, the parties relied completely on the testimony of particular witnesses in order to make their case. Both parties failed to comply with discovery orders and were dilatory in providing their opponents with information necessary to defend their cases.

Appellant's actions, like those of the appellant in *Heineman*, deprived appellees of the ability to mount a defense to the case. We believe that appellant's discovery violation, which was primarily due to his own lack of diligence, was therefore substantial and not merely technical.

### 2. Timing of Ultimate Disclosure

Appellant finally provided his expert's report to appellees two days before the hearing on the motion for summary judgment. We note, however, that the report was not provided to the court until February 11, 2000, when appellant attached Lundelius' report to his motion to alter or amend judgment.

Appellant suggests that this eventual disclosure makes up for the prior delays because the delay was "eminently curable" and there was no harm because the cases were to be heard by an auditor, who had not yet been appointed. We observe, however, that, while the expert was first designated on August 23, 1999, appellant had made no meaningful attempt to have Lundelius perform the analysis necessary to be able to render an opinion. In fact, as of the date of his deposition, on October 19, 1999, which was four business days prior to the

scheduled close of discovery, Lundelius had not yet been officially retained and had not been able to even begin his analysis. Furthermore, Lundelius indicated that he had not been asked to analyze the HH Trust, which was the subject of one of appellant's claims.

The delay in this case is not merely the two-month delay between the close of discovery and the date that the report was furnished to appellees. Rather, appellant has, during the entire course of this litigation, continually delayed providing appellees with the information necessary to prepare a defense. During his deposition, appellant repeatedly declined to answer questions regarding the basis for his allegations and referred to the fact that his expert would be providing the entire basis for his claims, thereby hampering appellees from making the preparations they needed in order to prepare a defense. Certainly, appellees needed time, after receiving Lundelius' report, to adequately address the issues raised therein.

Even though the lawsuits had only been pending for a year at the time the report was excluded and summary judgment was granted, appellees had been accused of gross misconduct with respect to both the AGM Trust and the HH Trust. Appellant was making numerous allegations against the trustees, including accusing them of attempting to curry favor in Prince George's County, where Murry's Steaks is located, by having invested trust funds in Prince George's County municipal bonds. We are not oblivious to the fact that there is a history of problems between appellant and, at the very least, Ira. From the beginning, appellant's behavior in this case seemed designed to drag this process out as long as possible rather than to resolve the matter in an expeditious manner. The timing of the submission of the expert's report, which had already been effectively excluded by the denial of appellant's December 9, 1999 motion to extend, could only further delay matters.

### 3. Reason for the Violation

Appellant's reason for the delay in furnishing Lundelius' report is set forth in his brief as follows:

[T]he litigation has placed a significant financial burden on Mr. Helman and his family. In October 1998, Ira Mendelson terminated Mr. Helman from Murry's Steaks, Inc. Since that time, Mr. Helman has been unemployed. Lundelius' services have been costly—approximately $80,000 to date—and estimated to approach $100,000 if this Court grants Mr. Helman's appeal and remands these consolidated actions to the trial court for further proceedings. Mr. Helman has encountered some difficulty making timely payments to Lundelius. In addition, Lundelius changed firms in the midst of performing his analysis and drafting his report. As a result, it took longer than anticipated for Mr. Helman to obtain the expert opinion from Lundelius. These circumstances do not warrant the trial court's exclusion of Lundelius' report and grant of summary judgment.[5]

■ Appellant's self-serving claims of impoverishment only serve to bolster the circuit court's decision in this case. Appellant is hardly a pauper. When the corpus of the AGM Trust was distributed after Ida's death, appellant received $1.7 million outright and his trust received $5.5 million, which has grown to $8.1 million and from which he is receiving income distributions. Moreover, over the years, there had been an estimated $8.6 million in *inter vivos* gifts made by Ida to him and for the benefit of his family. During his deposition, appellant repeatedly admitted having received large sums of money but refused to explain what he did with the money. In addition, since David became a trustee, appellant had requested, and was granted, extra funds from the HH Trust to spend on his son's bar mitzvah. By appellant's own account, he spent at least $50,000 on the bar mitzvah, which apparently took place during the course of these proceedings.[6]

---

5. This information is set forth in different parts of the record, including appellant's Supplemental Memorandum in Support of Motion to Modify Scheduling Order, Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment and the Declaration of Herby Helman filed January 14, 2000.

6. Appellees contend he spent $100,000 on this event.

█ Appellant's own delays in retaining Lundelius resulted in the report not being submitted before Lundelius changed firms in late December 1999. Lundelius' career moves should not be held against appellees, particularly when the report was supposed to have been filed a month prior to Lundelius' move.

### 4. Prejudice and Effect of Delay

The circuit court's decision with respect to prejudice is clear. The circuit court clearly believed that, in light of the accusations raised in the complaint against the trustees, the longer the matter was allowed to drag on, the more prejudice resulted to the trustees. We do not believe the circuit court abused its discretion in weighing the prejudice and finding that the trustees suffered greater prejudice than appellant.

The court found that the litigation costs to appellees also contributed to the prejudice. Although litigation is generally costly, appellees spent more than necessary due to appellant's obstructionist tactics in replying to discovery. For example, when appellees deposed Lundelius four business days prior to the discovery deadline, they discovered that Lundelius had yet to be formally retained, much less started his analysis, making the deposition a waste of time and money for appellees.

█ Appellant has failed to show good cause for his delay in completing discovery. *See Shelton*, 119 Md.App. at 333, 705 A.2d 25. We recognize the appropriateness of resolving cases on their merits and not sacrificing them on the altar of judicial efficiency. On the other hand, good faith compliance with scheduling orders is important to the administration of the judicial system and providing all litigants with fair and timely resolution of court disputes. Therefore, we conclude that the circuit court did not abuse its discretion when it decided in this case that further continuances were inappropriate.

### II. Grant of Summary Judgment

█ A Motion for Summary Judgment is granted only when there is no genuine dispute of material fact and the

party for whom judgment is entered is entitled to judgment as a matter of law. Md. Rule 2–501(e); *Nicholson Air Servs. v. Bd. of County Comm'rs*, 120 Md.App. 47, 61, 706 A.2d 124 (1998) (citation omitted). For the purposes of that determination, the circuit court must resolve all factual disputes, and all inferences reasonably drawn from the facts, in favor of the non-moving party. *Id.* at 62, 706 A.2d 124. We review the trial court's decision to determine if it was legally correct. *Id.*

As Lundelius' report was not accepted by the circuit court, the circuit court relied on the information provided to it in the motion for summary judgment and in appellant's memorandum in opposition. Again, appellant chose to rely solely on his expert's opinion by attaching a "Declaration of Charles R. Lundelius, Jr." to his memorandum in opposition to the motion for summary judgment. That declaration, however, did not provide any clues as to Lundelius' ultimate opinion in the case.

Appellant's complaints about the handling of the trust are basically threefold. He contends that he was never provided with accountings, that the trustees invested too heavily in fixed income investments to the detriment of the remainder beneficiaries, and that the trustees made loans to themselves. In his brief, appellant recognized that, because of the trial court's ruling, his claims about accountings and asset allocation are more or less disposed of by the trial court's ruling rejecting the expert's report. Nevertheless, appellant argues that "the trial court recognized that it had the option to grant partial summary judgment," and it should have done so based on the loans the trustees made to themselves and other family members. We will address each of appellant's complaints in turn.

### A. Request for an Accounting

With respect to his request for an accounting, we believe that, through discovery,[7] appellant was provided with

---

7. In his declaration, Lundelius indicated that he had been provided with the following relevant documents that had apparently not previ-

all of the information regarding the AGM Trust that would have been provided in an accounting. Thus, any past failures were apparently remedied.

*B. Claims of Improper Asset Allocation and Investment*

 With respect to appellant's claims of improper asset allocation and investment with respect to the AGM Trust, we note that,

[i]n administering the trust property, a trustee shall observe the standard of care that would be observed by a prudent person dealing with property of another and is not limited by any other statute restricting investments by fiduciaries.

Md.Code Ann. (1974, 1991 Repl.Vol., 1999 Supp.), § 14–405(c) of the Estates and Trusts Article ("ET"). The same "prudent person" standard is applicable to the trustee's investment of the trust property:

(b) A fiduciary shall:

(1) invest and manage fiduciary assets as a prudent investor would, considering the purposes, terms, distribution requirements, and other circumstances of the governing instrument and the nature of the fiduciary appointment;

(2) Exercise reasonable care, skill, and caution regarding the anticipated effect on the fiduciary assets as a whole under the facts and circumstances prevailing at the time of any action by the fiduciary;

(3) invest and manage not in isolation but in the context of the fiduciary assets as a whole and as part of an overall investment strategy that incorporates risk and return objectives reasonably suitable under the terms of the governing instrument and the nature of the fiduciary appointment;

---

ously been previously provided to appellant: "the Alfred G. Mendelson Trust tax returns, brokerage and bank statements for the Trust, correspondence and financial accounting statements from various financial institutions or investment companies holding Trust assets (including Zirkin–Cutler Investments, Inc.), and some individual tax returns for Ira Mendelson."

(4) Diversify investments unless, under the circumstances, the fiduciary reasonably believes it is in the best interests of the beneficiaries or furthers the purposes for which the fiduciary was appointed not to diversify;

(5) Review fiduciary assets within a reasonable time after acceptance of the fiduciary appointment and make and implement decisions concerning the retention or disposition of investments existing prior to the appointment in order to conform with this section;

(6) pursue an investment strategy that considers both the reasonable production of income and safety of capital, consistent with the fiduciary's duty of loyalty and impartiality and the purposes for which the fiduciary was appointed;

* * *

(c) A fiduciary's investment decisions shall be judged in accordance with the following guidelines and standards:

(1) No specific investment or course of action is, taken alone, prudent or imprudent;

(2) The fiduciary may exercise reasonable business judgment regarding the anticipated effect on the portfolio of fiduciary assets as a whole under the facts and circumstances prevailing at the time of the decision or action;

(3) The fiduciary shall have no liability for continuing to hold fiduciary assets existing at the time the fiduciary appointment was accepted or subsequently added pursuant to proper authority if, and as long as, the fiduciary, in the exercise of good faith and reasonable prudence, considers the retention to be in the best interests of the beneficiaries or in the furtherance of the goals of the governing instrument;

(4) Subject to all other provisions of this section, the fiduciary may retain as fiduciary assets an interest in the fiduciary, if the fiduciary is a corporation, or in any corporation controlling, controlled by, or under common control with the fiduciary; and

(5) in making an investment decision, the fiduciary may consider, without limitation:

(i) General economic conditions;

(ii) The possible effect of inflation;

(iii) The expected tax consequences of investment decisions or strategies;

(iv) The role each investment or course of action plays within the investment of the portfolio of fiduciary assets as a whole;

(v) The expected total return of the investment including both income yield and appreciation of capital;

(vi) The reasonableness of any costs associated with the investment; and

(vii) The status of related assets of beneficiaries.

(d) To the extent that any provision of this section is inconsistent with the terms of a governing instrument, the terms of the governing instrument shall control.

ET § 15–114(b)–(d).

The trust instrument did not include specific instructions on the investment of funds, any statement of purpose, limitation on liability and the like. Therefore, we look at the history of the AGM Trust in the context of ET § 15–114. We note that the corpus of the trust grew from approximately $420,000 to over $20 million throughout the life of the trust, from 1972 until Ida's death in 1996. The bulk of this increase was due to a sale of stock in Murry's Steaks to a publicly held company. Appellant does not now complain of this particular decision, of course, but he does complain that the profits were not invested as he would have liked.

Although the AGM Trust might have generated greater growth if the trustees had chosen different investments, we cannot say that they were acting imprudently or only for the benefit of the income beneficiary, Ida. Moreover, although appellant complains about Ida getting the primary benefit of the trustees' investment, he, in reality, profited through her, because she gave him and his family large amounts of money

from the proceeds of the AGM Trust. In this case, the remainder beneficiaries were well cared for, despite the fact that the trustees might have invested more aggressively than they did. The bottom line in this case is that appellant's position is supported only by allegations rather than facts and reasonable inferences drawn from such facts that the trustees did not meet the prudent investor standard set forth in the statute. Because there was no dispute of material fact, summary judgment was appropriate.

### C. Claims of Self–Dealing

██ Appellant's last argument concerns the fact that the trustees of the AGM Trust, namely Murry and Ira, made certain loans to themselves, which, he argues, constituted a *per se* breach of fiduciary duty.

The following loans made from AGM Trust assets are pertinent to this appeal: [8]

| Amount | Date | Borrower |
|---|---|---|
| $221,666 | Oct.1985 | Appellant |
| $221,667 | Oct.1985 | Ira |
| $221,667 | Oct.1985 | Herlene |
| $300,000 | 1986 | Appellant and his wife |
| $1 million | July 14, 1995 | Ira and his ex-wife [9] |
| $100,000 | 1996 | Appellant |
| $500,000 | May 1996 | Murry and his wife |

Appellant complains about all of these loans, but only the July 14, 1995, $1 million loan to Ira, and the May 1996, $500,000 loan to Murry involve self-dealing. These two loans

---

8. There are additional notes, mortgages, and contracts listed as former assets of the AGM Trust, but these do not relate to beneficiaries of the Trust.

9. Ira stated that he took no part in the decision to have the trust lend him money.

were made by the trustees to themselves. The October 1985 loan to Ira was made prior to his appointment as a trustee. The loans to Herlene and to appellant involved no self-dealing because neither was ever a trustee.

After reviewing the record, the undisputed facts as they relate to this issue are as follows: [10]

- The trustees loaned Ira $1 million on July 14, 1995, while Ira was a trustee of the AGM Trust. Ira was not involved in the decision and stated that "[b]ecause [the money] was being lent to me, I really left the decision to Murry." This loan was secured by a house located on Loch Lomond Drive in Bethesda. When the house had first been put on the market, it had been appraised by the real estate company at over one million dollars. The interest rate on the loan was determined by calling various lending institutions and inquiring about the current home mortgage interest rates. This loan was paid back with interest.

- The trustees loaned Murry $500,000 in 1996, while Murry was a trustee of the AGM Trust. Ira was familiar with Murry's finances and net worth and considered him to be credit worthy. This loan was secured by a deed of trust on Murry's home on Spruce Tree Circle. Ira determined the interest rate on this loan by calling lending institutions, looking in the newspaper, and determining what the prevailing home mortgage interest rates were at the time. This loan was also repaid with interest.

- At the time the loans were made, Ira and Murry had discussed the matter and determined that, since they were making fixed income investments anyway, "we were going to pay interest and they were market rates of interest, we might as well pay the interest to ourselves through the trust." Ira felt that both he and

---

**10.** This information comes primarily from the exhibits attached to appellant's memorandum in opposition to the motion for summary judgment.

Murry would have been able to get similar loans from banks, but they decided to take the loans from the AGM Trust.

● Appellant was not asked to consent to these loans, and he did not know about them until approximately June of 1996.

The trust instrument provided as follows:

In the investment, administration and distribution of my estate and of the trusts hereby created, the executors and trustees may perform every act in the management of my estate and of the trusts which individuals may perform in the management of like property owned by them, free of any trust including by way of illustration the following powers:

\* \* \*

To invest and reinvest all funds from time to time available for investment or reinvestment in any kind of property, real or personal, including by way of illustration: Bonds, interests in any amount in common trust funds, stocks of any class, *mortgages,* and other investments and property as they shall deem proper and *for the best interests of the beneficiaries, irrespective of any rules of law governing the investment of trust funds.* [Emphasis supplied.]

The trustees contended that whether these loans were improper was a question of law and not of fact, and appellant never disputed this point. Moreover, appellant has failed throughout these proceedings to point to any evidence to show that he was damaged in any way by these loans, other than to make vague allegations that the loans should not have been made and that the loans damaged him in an unspecified manner.

After reviewing the facts set forth above, the only thing left for the circuit court to do was decide, as a matter of law, whether the loans were improper. The circuit court stated in its ruling:

But the allegations of diversion of substantial assets of the trust to finance private loans to themselves and their families, the allegations that they have engaged in a pattern of self-dealing ... which are contained within the plaintiff's complaint are serious allegations. And the trustees deserve to have this matter concluded.

\* \* \*

It is clear to me from the evidence that I have before me that there is no fact in dispute that would allow this case to proceed against the trustees.

The history of the trust that is involved here, *the history of performance of the trustees does not give rise in the evidence I have before me to a material fact in dispute that would allow the plaintiff to pursue his claims against the trustees in either of these cases on any of the claims that are before me.* [Emphasis supplied.]

Appellant's first full briefing of this issue occurred after the motion for summary judgment was granted when he argued, in his motion for reconsideration, for the first time, that when a trustee loans money to himself from a trust, he commits a *per se* breach of fiduciary duty of loyalty, rendering him automatically liable. Appellant makes this same argument on appeal and cites two cases in support of this proposition. The first case concerned disciplinary action against an attorney who had, *inter alia,* made loans to himself from the assets of a trust that he administered. *Attorney Grievance Comm'n of Maryland v. Owrutsky,* 322 Md. 334, 346–47, 587 A.2d 511 (1991). The second case involved a trust set up by a court to manage the estate of an incompetent beneficiary. *Veterans' Administration v. Hudson's Estate,* 169 Md. 141, 143, 179 A. 836 (1935). Neither of these cases involved trustees who were also beneficiaries, and neither establishes a bright line rule that a trustee is strictly liable whenever he lends money to himself.

When a trustee loans money to himself, he, of course, is engaging in a form of self-dealing. Restatement (Second)

Trusts § 170 cmt. 1 (1959).[11] Although this sort of self-dealing may result in a finding of breach of the duty of loyalty, it is not considered to be *per se* improper. *See* Restatement §§ 205–206; Jason L. Smith, Comment, Stegemeier v. Magness: *An Analysis of a Trustee's Fiduciary Duty in Self–Interested Transactions,* 14 Quinn. Prob. Law J. 605 (2000); Charles Bryan Baron, *Self–Dealing Trustees and the Exoneration Clause: Can Trustees Ever Profit from Transactions Involving Trust Property?,* 72 St. John's L.Rev. 43 (1998).

The settlor's intent is controlling in the management of a trust. *Benadom v. Colby,* 81 Md.App. 222, 236, 567 A.2d 463 (1989); *Mercantile–Safe Deposit & Trust Co. v. Purifoy,* 280 Md. 46, 56, 371 A.2d 650 (1977). Unless the trust provision is void as against public policy, a trustee must act in conformance with the trust instrument,. *See* Restatement § 164; ET § 15–114(d). The trust instrument in this case specifically allowed the trustees to invest in mortgages and instructed the trustees to proceed in the best interests of the trust beneficiaries, "irrespective of any rules of law governing the investment of trust funds."

Although Alfred did not specifically authorize loans to trustees who were also beneficiaries of the trust, he explicitly elevated the beneficiaries' interests over the rules governing trust investment by the exculpatory provision of the trust. This form of exculpatory clause is designed to protect the trustees who act in the interests of the beneficiaries when that act may be contrary to the law of trusts governing certain types of investment. In Maryland, exculpatory clauses are generally deemed to be valid and enforceable.[12] *Wolf v. Ford,*

---

**11.** Unless otherwise indicated, all further references to a Restatement will be to the Restatement (Second) Trusts.

**12.** Three exceptions have been identified where the public interest will render an exculpatory clause unenforceable. They are: (1) when the party protected by the clause intentionally causes harm or engages in acts of reckless, wanton, or gross negligence; (2) when the bargaining power of one party to the contract is so grossly unequal so as to put that party at the mercy of the other's negligence; and (3)

335 Md. 525, 533 n. 4, 644 A.2d 522 (1994); *Seigneur v. National Fitness Inst., Inc.*, 132 Md.App. 271, 281, 752 A.2d 631 (2000). Although exculpatory clauses are generally enforceable, this clause is not the sort of broad based explicit relief from liability that is often seen in these clauses. *See, e.g.*, Baron, 72 St. John's L.Rev. at 57–64.

Nevertheless, because appellant has failed to generate a dispute of material fact demonstrating a lack of good faith on the part of Ira and Murry in making these loans or that Ira and Murry profited from the loans at the expense of the AGM Trust or its beneficiaries, we believe the circuit court's decision was correct. Commentators have held that "where [a trustee] makes such a loan [to him or herself], he [or she] is chargeable with principal and interest, or with any profits he makes thereby, at the option of the beneficiaries." William H. Fratcher, IIA SCOTT ON TRUSTS § 170.17 (4th ed.1987). *See also* Restatement §§ 205–206. In this case, there appears to have been no profit to the trustees, nor does appellant complain of any wrongdoing other than that the loans were *per se* improper.

If appellant had generated a dispute of material facts or permissible inferences from such facts that the loans were made on terms more favorable than Ira or Murry could have received from a bank, the difference would be recoverable by the AGM Trust. If appellant had generated a dispute of material facts or permissible inferences from such facts that the loans resulted, in some other way, in profit to either Ira or Murry, the AGM Trust would have been able to recover that amount as well. Appellant has made neither allegation, and has not provided the court with facts tending to show damages.

---

when the transaction involves the public interest. None of these exceptions apply to this case.
*Seigneur v. National Fitness Inst., Inc.*, 132 Md.App. 271, 282–83, 752 A.2d 631 (2000) (citing *Wolf v. Ford*, 335 Md. 525, 531–32, 644 A.2d 522 (1994)).

The facts surrounding the loans Murry and Ira made to themselves are undisputed. Thus, the propriety of these loans became a legal question. We believe the circuit court was correct.

### III. Denial of Motion to Alter or Amend Judgment

We review a circuit court's denial of a motion to alter or amend judgment for abuse of discretion. *Jones v. Mid–Atlantic Funding Co.*, 131 Md.App. 614, 628–29, 750 A.2d 638, *cert. granted*, 360 Md. 273, 757 A.2d 809 (2000) (citing *Friends of the Ridge v. Baltimore Gas & Elec. Co.*, 120 Md.App. 444, 490, 707 A.2d 866 (1998)).

> [Abuse of discretion] has been said to occur where no reasonable person would take the view adopted by the [trial] court, or when the court acts without reference to any guiding rules or principles. It has also been said to exist when the ruling under consideration appears to have been made on untenable grounds, when the ruling is clearly against the logic and effect of facts and inferences before the court, when the ruling is clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result, when the ruling is violative of fact and logic, or when it constitutes an untenable judicial act that defies reason and works an injustice.

*Jones*, 131 Md.App. at 629, 750 A.2d 638 (citations omitted).

The circuit court did not abuse its discretion in denying appellant's motion. Although when the court granted summary judgment it had not seen Lundelius' report, we have already held that the trial court's decision to exclude Lundelius' report was not an abuse of discretion.

We believe no reasonable person knowing the facts and circumstances of this case would find that the circuit court's action defied reason.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**